Dana W. Brown v. Commissioner.
Brown v. Commissioner
Docket No. 2456-67.
United States Tax Court
T.C. Memo 1970-253; 1970 Tax Ct. Memo LEXIS 114; 29 T.C.M. (CCH) 1126; T.C.M. (RIA) 70253; August 31, 1970, Filed Stanley M. Rosenblum, Suite 430 Paul Brown Bldg., 818 Olive St.,St. Louis, Mo., and Mortimer A. Rosecan, 706 Chestnut, St. Louis, Mo., for the petitioner. Charles M. Lock, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1962, 1963, and 1964 in the amounts of $7,317.67, $8,928.03, and $2,545.54, respectively. The issue for decision is whether expenses in the amounts of $7,917.33 in 1962, $14,024.81 in 1963, and $5,701.72 in 1964, claimed by petitioner to have been incurred in connection with safaris, are deductible *115 under section 162, I.R.C. 1954, as ordinary and necessary business expenses. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. Dana Brown (hereinafter referred to as petitioner) who resided in St. Louis, Missouri at the time of filing the petition in this case, filed his Federal income tax returns for the taxable years 1962, 1963, and 1964 with the district director of internal revenue, St. Louis, Missouri. Petitioner was born in 1913 in West Virginia. He attended school through the eighth grade in a one-room building for six months of each year. For a year after he finished the eighth grade, petitioner worked in the coal mines and lumber camps of West Virginia. He then went west working on the railroads or as a ranch hand. At the age of 17 years, he was a Fuller Brush salesman *116 in Toledo, Lima, Detroit, and Ft. Wayne. In 1931 he went to work for Woolson Spice Company selling coffee first in Detroit and later in Cleveland. His job was to find new accounts and build up new territory by store to store selling of bulk branded coffee. When he started this job in Detroit he received a $200 per month drawing account which was later increased to $300 per month. 1127 In 1935 petitioner went to work as a coffee salesman for Super Value in Minneapolis, Minnesota selling bulk coffee and some packaged coffee from grocery store to grocery store. He earned a gross of $500 per month out of which he had to pay his own expenses, leaving him approximately $200 net per month after expenses. After 4 years with Super Value petitioner accepted a similar position with the Fleming Company in Topeka, Kansas where his gross earnings were approximately $600 monthly. In 1946 petitioner went to St. Louis, Missouri to become an employee of General Grocer Company, a wholesale grocer whose coffee business was mostly bulk sales. By 1950 as one of 60 coffee salesmen for that company he grossed approximately $800 per month. From 1931 to 1950 petitioner's earnings were about the same *117 as the average salesman of unbranded coffee to grocery stores. The salesmen of unbranded coffee had not only to sell the coffee to the stores but also to show the stores how to sell the coffee to their customers in order to have reorders from the stores for replacement of the coffee sold. Generally salesmen of unbranded coffee encountered difficulty in persuading retail grocers to push the sales of coffee which was not nationally advertised to the same extent as sales of nationally advertised brands such as Maxwell House, Folger, Hill's Coffee, or Butternut Coffee were pushed. In the latter part of the 1940's General Grocer Company put in new equipment which permitted coffee to be put in vacuum cans. This created the possibility of greater sales of unbranded coffee by this company. Petitioner was of the opinion that he could take better advantage of the opportunity for increased sales if he knew more about the product he sold. For this reason, in 1950 petitioner decided to go to the West Indies, Cuba, Jamaica, and Santo Domingo to learn how coffee was grown and thereby increase his knowledge of the coffee business. He felt that he could learn much more from visiting the coffee-growing *118 countries than trying to learn about coffee from books. He took no pictures on his 1950 trip but after his return he found that his customers were very interested in hearing about his trip. In 1951 petitioner spent 2 months in South America and Central America taking pictures of growing coffee plants and the natives in their homes and at their work. In 1952 he went into the coffee-growing countries of East Africa taking pictures to show his customers when he returned. In 1953 he visited other African countries which grew coffee. By 1953 in addition to his still camera he had purchased and was using a small movie camera. As a result of having taken these pictures, petitioner was invited to group meetings of merchants to show his pictures and to explain about the lives of the people of the coffee-growing countries. At that time some of the coffee petitioner was selling was actually coming from the countries shown in these pictures. By 1953 his trips to coffee-growing countries had enabled him to acquire considerable first hand knowledge of types of coffee and of coffee-growing conditions. He would share this knowledge with his customers. His customers were keenly interested in his *119 pictures. However, they would ask him questions about hunting in the countries he visited and particularly about hunting in Africa. These questions and the intense interest displayed by his customers with respect to the wild animals he had seen and whether or not he ever shot any such animals influenced his decision in 1954 to go on a hunting safari to the Belgian Congo. He also was of the opinion that such a safari would afford him the opportunity of taking more interesting pictures for his customers. In order to take pictures of animals in their native habitat instead of a park setting, petitioner had to go into the remote areas of the back country of the Congo, where the hunter must rely on his hunting for food. Petitioner found that the glamour and romance of his pictures were increased when they contained some hunting scenes. During his 1954 and 1955 safaris petitioner was using a better camera than he had used on his prior trips and by this time he had become a better photographer. The quality of his pictures by 1955 were such as to require no adjustment when they were shown on television. Manhattan Coffee Company (hereinafter referred to as Manhattan) a wholly owned subsidiary *120 of General Grocer Company, petitioner's employer, paid some of petitioner's expenses for his 1956 safari. Petitioner's pictures from Africa were used in Manhattan's television commercials with favorable response. The sales by Manhattan Coffee Company of both its private brands and its Manhattan brand of coffee increased with the safari advertising. Manhattan coffee became a major brand very quickly and as a result was introduced in the stores of 1128 A&P, Kroger's, National Tea, and other major outlets. In 1957 petitioner went on another safari and Manhattan again paid some of his expenses. Petitioner kept his employers informed of his use of the safari pictures throughout Manhattan's trade area in numerous presentations and meetings. In 1956 petitioner was given the title of president of Manhattan. His function was primarily sales and participating in formulating the company's advertising program. He devoted 95 percent of his time to these activities. During 1955 to 1957 Manhattan had 10 to 12 men selling a total of 8 million pounds of coffee yearly. Petitioner personally made sales of 2 million pounds of Manhattan brand coffee and 4 million pounds of private label coffee to *121 customers such as Shur-Fine, I.G.A. and Dillon. The remaining 5 percent of petitioner's working time was devoted to maintaining Manhattan's relationship with the teamsters union and advertising agencies, and presiding at sales meetings. Petitioner did not deal with budget and financial policies or other phases of Manhattan's operation. Petitioner did not set fiscal policies for Manhattan except to the extent such policy was set by the board of directors of its parent General Grocer Company of which he was a member. Petitioner's yearly salary with Manhattan prior to 1958 had been $30,000 to $35,000, including bonuses. In 1958 petitioner acquired an option to buy Manhattan which he sold to Cain Coffee Company (hereinafter referred to as Cain). After that company exercised the option, petitioner remained with Manhattan and agreed to take a cut in salary to $15,000 for a trial period until he could prove his worth to the new company. Cain would not have purchased Manhattan if petitioner had not agreed to remain with the company for awhile. Petitioner had acquired a lease on the building in which Manhattan was housed which he retained when he sold the option to purchase Manhattan to Cain *122 giving Cain an option after one year to purchase the lease for $150,000. Petitioner received from the sublease of the building to Cain approximately $20,000 net annually. In 1960 petitioner's salary was increased to $35,000 because by then he had demonstrated to Cain his ability to sell coffee. His salary remained at $35,000 until he left Manhattan in 1966. [2]
In 1958 petitioner did not take a safari. In 1959 the officials of Cain were not in favor of petitioner's going on a 2-month safari. Petitioner's request for 2 months leave for this purpose was denied. However, petitioner felt that the safari was essential to his progress in the business of selling coffee. He decided to go on the safari even though Cain was not in favor of his going, would not defray any of his expenses or pay his salary for more than a 1-month leave. Cain's position remained the same during the years 1962, *123 1963, and 1964. Petitioner went on a safari into Nepal in March 1959. He did not specifically request Cain to have Manhattan pay the safari expenses because he knew his employer's position as to his taking a safari from the refusal of his request for a 2-month leave for that purpose. While still employed as president of Manhattan in 1960 and 1961 petitioner went on safaris. In 1962 petitioner went on a safari to India and Nepal from which he returned by way of Vietnam. In 1963 petitioner went to Angola, Africa and in 1964 he again went to Nepal. When Cain purchased Manhattan it discontinued the use of safari films made by petitioner in its television advertisements of Manhattan coffee. Cain preferred a type of commercial which dealt more with the quality of the product and contained more of a selling message than did the safari commercials. Also, officials of Cain considered the safari advertisement to be more of a promotion of petitioner personally than of Manhattan coffee. Petitioner's employment with Manhattan was in no way dependent upon his taking a safari. His salary was not set or adjusted to cover safari expenses. Manhattan had a policy of reimbursement of its officers, *124 including petitioner, for all authorized expenditures. The expenses for which reimbursement was made included travel within the trade area, hotel, meals, and entertainment of customers. These expenses ran $800 or more a month for petitioner and in addition petitioner was supplied with an automobile with all expenses thereof paid by Manhattan. During each of the years 1962, 1963, and 1964 petitioner went on a 2-month safari. Petitioner did not purchase coffee for or make any reports on the 1129 coffee-producing areas that he visited to his employer. During the years 1962, 1963, and 1964 Manhattan purchased the majority of its coffee from the South and Central American countries with a small amount being purchased in Africa. Manhattan purchased no coffee from India, Vietnam, or Nepal. Petitioner paid all of his expenses in connection with any safari taken during the years here involved. Petitioner's salary of $35,000 was the amount the management of Manhattan felt to be proper compensation for his sales productivity. While a drop in Manhattan's sales for one or two years would not necessarily have caused a reduction in petitioner's salary, for petitioner to continue to earn $35,000 *125 per year with Manhattan, it was necessary for him over the long run to maintain his sales productivity. In fact, Manhattan's sales and profits increased yearly from the time Cain purchased the company throughout the time petitioner remained its president. Cain's president recognized that the safaris and pictures therefrom as used by petitioner tended to build up the private labeled coffee business of Manhattan which petitioner controlled. Since Manhattan would benefit from these pictures only so long as petitioner remained with Manhattan, the president of Cain did not consider the expense of the safaris to be of sufficient advantage to Manhattan as distinguished from the personal reputation of petitioner to warrant Manhattan's bearing of any of the expenses. When petitioner left Manhattan in 1966 and started his own coffee business, he took with him the major private label accounts of Manhattan to-talling at that time approximately 5 million pounds of coffee per year. The profit margin of Manhattan on its brand name Manhattan coffee was much greater than on its unbranded or private label coffee. A large volume of private label sales was helpful in keeping the company's plant operating *126 and spreading overhead expenses even though the profit margin was small as compared to the profit margin on Manhattan brand coffee. Cain was more interested in pushing sales of Manhattan brand coffee than sales of unbranded or private label coffee. Because of his films, petitioner was invited to regional meetings of dealers in coffee. Sometimes as many as 200 dealers would be present and many of them would bring their wives and families. When one of petitioner's films was scheduled for showing at a regional meeting of such dealers, the attendance at the meeting would generally be larger than usual. Petitioner was permitted to speak at these meetings only in connection with showing his pictures. When he would show his film he would talk about coffee and methods of merchandising coffee. In addition to appearing at regional meetings of coffee dealers, he would also appear at branch or divisional meetings in at least 12 States. In some cases when invited to speak and show his pictures at a particular meeting, he would be informed that he should not talk about coffee. However, the films would promote questions which he would use as a basis for talking about coffee and the particular coffee *127 grown in the area shown. He worked coffee and coffee salesmanship into the film by explaining to his customers how going into the hunting area took him into the coffee-growing areas. He explained at what altitude the coffee is grown and why. He explained how coffee of equal quality could be obtained for less money in Africa than in Brazil. Petitioner's safaris were written up a number of times in the St. Louis Food News as well as in the St. Louis Post-Dispatch and the St. Louis Globe-Democrat and other papers throughout the area around St. Louis. The St. Louis Food News is a trade paper which reaches 5,700 food dealers within a 100-mile radius of St. Louis. It reaches most of petitioner's customers. Petitioner spoke and showed his film at numerous coffee industry banquets from year to year, thereby receiving publicity. In 1964 petitioner was the guest speaker at a father and son banquet of food dealers. In January 1966 petitioner was billed on the program of the annual meeting of stock-holders of Shur-Fine Grocers at Amarillo, Texas as "Mr. Shur-Fine Coffee." Petitioner showed his film to about 150 grocery men stockholders in attendance at the meeting. Petitioner sent Christmas *128 cards to his customers with pictures of animals killed by him, safari camps, or people of the countries in which he took his safaris. Petitioner also made guest appearances on television shows such as To Tell the Truth and the Bob Hope show. Petitioner developed a reputation for being an authority on coffee. In the St. Louis Globe-Democrat of January 17, 1964, petitioner was quoted as saying that there would be a 10-cents to 12-cents a pound increase in the price of coffee because of 1130 drought, freeze, and forest fires in Brazil, the world's largest coffee producer. In the financial section of the St. Louis Post-Dispatch dated March 2, 1964, a statement of petitioner concerning coffee price increases due to the crop failure in Brazil was quoted. Petitioner's appraisal of the significance of the frost in Brazil on the price of coffee was carried by the Associated Press media. Because of petitioner's reputation as an authority on coffee, he was able quite often to get the retailers to feature the private label coffee which they sold in their weekly advertisements for the stores and to set up big and attractive displays of this coffee. Petitioner received more cooperation from *129 the retailers than did the advertising management of the particular chain. Petitioner never took any coffee buyers or customers with him on safaris. During the years here in issue he took a professional photographer with him and persons necessary to manage the safari. As petitioner's safaris went into more remote areas, the cost of the safaris increased. Also, as petitioner's pictures improved in quality, the cost of obtaining them increased. The cost of the pictures increased because of petitioner's use of color film which could be shown on color television. The film which petitioner uses in his talks runs from 20 to 25 minutes, and consists of approximately 1,000 feet of film. [3] Petitioner cannot judge accurately the quantity of film necessary to produce a 1,000 foot safari picture of the type he wished to show. In each of the years at issue petitioner took about 7,000 feet of film. Out of this 7,000 feet of film approximately 5,000 feet was usable film. The remaining footage consisted of poor shots, pictures with lighting defects, or pictures with some other defect. The 5,000 usable feet of film would be edited and parts of it, generally with footage from prior films, would *130 be used to obtain the 1,000 feet to tell the story of the current safari trip. Petitioner kept all of the unused film to use for incorporation with pictures to be taken on subsequent safaris. Often the older film is used as background. In the final safari film produced from pictures taken on the safaris in the years here in issue, some film from prior years was used. Petitioner believed that in order to maintain the viewer's interest he should have a different film each year. Even though some film might be shown 30 to 35 times to different audiences, petitioner would each year show a film to some of the same audiences. During the years 1962, 1963, and 1964 petitioner spent at least $7,917.33, $14,024.81, and $5,701.72, respectively, in connection with his safaris and taking of the pictures of his safaris. These amounts of expenses were documented by checks drawn to payees, the names of which generally indicated the nature of the expenditures. Petitioner on his Federal income *131 tax return for each of the years here in issue deducted the amounts stated in the preceding paragraph as expenses of his safari as ordinary and necessary business expenses. Respondent in his notice of deficiency disallowed the claimed deductions with the explanation that petitioner had not established that the amounts constituted ordinary and necessary business expenses. Opinion Respondent's primary position in this case is that petitioner's safari expenses were personal expenses. Respondent argues that even though the safaris might have had some connection with petitioner's business as the president of Manhattan, they were primarily for his personal enjoyment of his hobby of big game hunting. In the alternative, respondent contends that the expenses of the safaris were expenses of Manhattan paid by petitioner, and if not, they were in the nature of capital expenditures to build petitioner's reputation. Finally, respondent contends that in any event the expenses were of the type of traveling expenses which would be required to be substantiated under section 274, I.R.C. 1954, [4] in order to be deductible under section 162 and that petitioner has not properly substantiated the expenses. *132 Petitioner takes the position that the expenses though involving travel are advertising and promotion expenses which do not fall under section 274, but if they do, there is proper substantiation, that the amounts are ordinary and necessary business expenses of the current year and not in the 1131 nature of capital expenditures, and that these expenses are properly deductible by petitioner since they were for a purpose which was helpful to him in his business as a coffee salesman employed by Manhattan. From the facts we have set forth, we conclude that although petitioner may have enjoyed his safaris, the primary reason that he continued to go on these trips was to obtain pictures to show to various organizations and groups of individuals who had some connection with businesses that sold coffee. We consider the facts we have found sufficient to dispose of respondent's contention that the safaris were purely a hobby of petitioner. While the travel involved in the cost of the safari trips was somewhat of a different nature from the travel which is ordinarily governed by the provisions of section 274, we need not *133 decide whether that section is applicable to the expenditures here involved. We conclude and have found that to the extent of the amounts claimed by petitioner to be deductible on his Federal income tax returns for the years here involved the items are satisfactorily substantiated by checks which indicate the purpose for which drawn. [5]
We consider that our findings dispose of respondent's arguments that the expenses are expenses of Manhattan which petitioner should have looked to Manhattan to defray. The record shows that Manhattan would not bear any portion of petitioner's safari expenses in the years here in issue. This fact distinguishes the instant case from Noland v. Commissioner, 269 F. 2d 108 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court, and William C. Stolk, 40 T.C. 345 (1963), affirmed 326 F. 2d 760 (C.A. 2, 1964), relied on by respondent. This leaves for our consideration the issue of whether the *134 expenditures of petitioner for his safaris in the years here in issue were sufficiently related to petitioner's current business of being president of Manhattan to be deductible as business expenses or were more nearly in the nature of capital expenditures. Expenditures for acquiring reputation, learning, and goodwill are not ordinary and necessary expenses of the "operation" of a taxpayer's business. Welch v. Helvering, 290 U.S. 111 (1933). From our findings, it is apparent that the film taken by petitioner on his safari expeditions was an asset with a useful life substantially in excess of 1 year and in fact it was used in more than one year. There is nothing in the record to indicate the useful life of the 5,000 feet of good film shot by petitioner on each safari. Petitioner in his testimony gave some indication that the useful life of this film was more or less indefinite. [6] However, the fact that the film had a useful life of a number of years is not determinative of the issue in this case. Even though the pictures were taken on the safaris to enable petitioner to make use of the pictures in his talks to coffee dealers, the primary purpose of the trips was to *135 have petitioner's personal experiences made a part of his talks. *136 1132 As our findings state, through the years petitioner was improving his reputation and increasing his rapport with retailers of coffee through his continued safari trips. The record also shows petitioner's personal reputation and his ability to influence the advertising and selling practices of coffee retailers was far more helpful in selling unbranded and private labeled coffee than brand named coffee. While certainly, the officials of Cain who controlled Manhattan would not be desirous of losing the private brand sales, the sales of Manhattan brand coffee which produced a higher profit margin were of far greater significance to Cain than sales of private brands. [7]
*137 Petitioner recognizes his showing of safari films assisted him in maintaining his reputation in the coffee industry and his influence with the retail grocers who sold coffee. Petitioner argues, based on our holding in Sanitary Farms Dairy, Inc., 25 T.C. 463 (1955), that even though advertising has a value which extends over more than one year, it is by its nature an item which should be deductible in the year the expenditure is made. Petitioner further argues that the cost of the safaris was an expense of protecting and maintaining goodwill, as distinguished from developing or acquiring goodwill, and therefore as an ordinary and necessary business expense. Petitioner cites a number of cases in support of this contention, including Santa Anita Consolidated, Inc., 50 T.C. 536, 561 (1968), and some of the cases there cited. In Sanitary Farms Dairy, Inc., supra, at 467-468, we stated: The Commissioner * * * contends, as an alternative to complete disallowance, that the remainder of the 1950 expenditures, if legitimate advertising expense, should be spread over later years. There is no pleading to support any amortizing of the amount. Advertising *138 expense is normally deductible in the year paid or accrued. Consolidated Apparel Co., 17 T.C. 1570, affd. 207 F. 2d 580; A. Finkenberg's Sons, Inc., 17 T.C. 973; X-Pando Corporation, 7 T.C. 48; Colonial Ice Cream Co., 7 B.T.A. 154; Carey Machinery & Supply Company v. Hofferbert, 42 A.F.T.R. 1281. * * * In the instant case respondent disallowed the claimed deductions on the ground that petitioner had not shown them to be ordinary and necessary business expenses. At the trial respondent's counsel stated that respondent in the alternative took the position that the expenses were in the nature of capital expenditures. Therefore, in this case as distinguished from Sanitary Farms Dairy, Inc., supra, the issue as to the capital nature of the expenditures is properly before the Court. Also, in Sanitary Farms Dairy, Inc., the expense was that of the corporation for its own advertising. In the instant case Manhattan was unwilling to make an expenditure on petitioner's safaris. Certainly, it was not incumbent on petitioner to make expenditures for advertising of Manhattan's products. If petitioner is *139 entitled to deductions for the safari expenses, the deduction is not as advertising expenses for Manhattan but as expenditures helpful to him in his business of being an employee of Manhattan. Therefore, the holding in Sanitary Farms Dairy, Inc., with respect to whether the expenditures were in the nature of expenditures for a capital asset is not helpful in the disposition of this case. In our view the import of the record is that petitioner's safari trips and the expenditures connected therewith were primarily for the purpose of enhancing his personal reputation with dealers in coffee and improving his ability as a coffee salesman. Therefore, the expenditures for the safaris more nearly resemble expenditures to develop goodwill than expenditures to maintain goodwill. Certainly while he was with 1133 Manhattan petitioner wanted to increase the sales of Manhattan. The record shows that Manhattan's top management was primarily interested in increasing sales of Manhattan brand coffee, whereas the safari pictures were useful primarily in connection with sales of unbranded private label coffee. On the basis of the record we conclude that the safari expenditures were primarily to *140 build up petitioner's personal reputation and only incidentally to increase Manhattan's sales. Petitioner argues that his reputation had been built up in the early 1950's and needed no further building up during the years here in issue. This contention is not supported by the record. The record shows an ever increasing build-up of petitioner's reputation and goodwill with coffee dealers. The testimony of the president of Cain, who was also the chairman of the board of Manhattan shows that in his view and that of other officials of Manhattan the expenditures for these safaris primarily resulted in the promotion and enhancement of the reputation of petitioner. [8]
*141 Petitioner cites several cases in which we have permitted an employee to deduct expenditures which were helpful to him in his business of being an employee. Representative of the cases cited is Harold A. Christensen, 17 T.C. 1456 (1952), in which we held that a supervisor of salesmen who was paid both on a salary and bonus basis could deduct $300 spent on entertaining salesmen under his supervision as an ordinary and necessary business expense. In that case we found that the expenditures the taxpayer made in entertaining and making gifts to salesmen and their families were made so that the "business of his employer might prosper and his own earnings increase." In the instant case petitioner's salary was not on a bonus basis and there is no indication in the record that his salary would be increased because of his bringing about increased sales for Manhattan. In fact the indication is to the contrary since petitioner did increase the sales of Manhattan with no increase in his salary. The record does indicate that had the sales of Manhattan declined over a substantial period of time, the officials of Cain might have reconsidered petitioner's salary. [9]
*142 A reasonable assumption would be that some adjustment would be made in the salary of any company president who permitted sales to decline over a substantial period of time. There is nothing in the 1134 record to indicate that the sales of Manhattan, particularly those of the Manhattan brand in which its management was most interested, could not have been maintained by petitioner through the normal advertising of Manhattan and the substantial expenditures for which Manhattan reimbursed him for entertainment, travel, and sales expense. The record is certainly clear that the safari expenditures were not necessary to petitioner's keeping his position or salary with Manhattan in any particular year here in issue. We are not unaware that some advantageous results in the current year flowed from the expenditures. However, this is always true of developing goodwill or reputation. If capital assets of this nature have an ascertainable useful life, their cost may be amortized. There is nothing in this record to show that the reputation and goodwill petitioner was developing had an ascertainable useful life. As we have heretofore pointed out, this record does not even show the useful *143 life of the film obtained on the safaris. If the film were the primary capital assets produced by the safaris, it might be incumbent on us to attempt to determine its useful life even in the absence of any adequate evidence. This record, however, shows that the film was only incidental to and an assistance in petitioner's development of personal goodwill with coffee retailers. Therefore, based on this record, we conclude that petitioner's expenditures for safaris during the years here in issue were primarily for building up his reputation and goodwill and therefore under Welch v. Helvering, supra, not deductible as ordinary and necessary business expenses. Decision will be entered for respondent. Footnotes
1. In the original petition an issue was raised with respect to the disallowance of certain automobile and entertainment expenses, but this issue was not raised by the amended petition, and at the trial petitioner specifically conceded this adjustment by respondent and another adjustment made in the notice of deficiency and not raised by the pleadings to be correct.↩
2. Apparently, from the testimony, Cain was purchased in 1960 or 1961 by Nestle Company but Cain continued to own the stock of Manhattan and to control Manhattan. Also around 1960 Cain exercised its option to purchase petitioner's lease on the building in which Manhattan's operations were carried on.↩
3. Petitioner introduced one of his safari films into evidence. Its running time was between 20 and 25 minutes. The film had actually been shown by the petitioner in making talks between 25 and 30 times.↩
4. All references are to the Internal Revenue Code of 1954.↩
5. At the trial evidence was introduced of amounts of several thousand dollars of other expenses paid by cash which were not substantiated by precise documentary evidence, but those amounts are not here in issue.↩
6. Petitioner testified as follows in this respect: Q. If in three safaris you should average about 5,000 feet of usable film each, that would be 15,000 feet, yet Exhibit 6 only contains 1,000 feet? A. Yes sir. Q. What has happened to the other 14,000 feet of usable film? A. We have them in what you call raw film, undeveloped film. To make a film like this you have to select parts from other films, things that fit. It is like a crossword puzzle, you must fit it in. For example, I have just made a film. I picked out pictures from 1954 and '55 on a Belgian Congo safari, pictures I took in 1954 and '55. They laid there for seven, eight years, you see, or longer, but I need them. I may never need them but you must have them. Q. When you take 7,000 feet of film on a safari, can you give Her Honor any estimate of the life, the useful life of that film, does it have any definite useful life? A. There is no way to put a value or a price on it. Q. No, I mean useful life, a period of time? A. If I can ever find a place to fit it in, I can use it and you always hope that you can use parts of those and parts of others and make up other films, which I try to do every year or every second year, certainly. Q. Why is it that there will be parts of films taken on safaris that you can't use within one, two, or three, or four years? A. For example, if you don't mind me making an example, I am making a leopard picture, a story of a leopard. It is a very interesting animal and I am making a story of a leopard, see. Last year I was working on the same story, but unfortunately the photographer blew it, he wasn't used to back jungle photography and he made an error, he made a movement and the leopard was gone. I got forty seconds however, of just magnificent film. * * * This year I have excellent leopard pictures, but I needed a climax for the fine pictures, I needed a climax. The forty seconds that I got last year will make the most wonderful climax because forty seconds, although it is only forty seconds, are simply fantastic pictures.↩
7. In this respect the president of Cain testified as follows: Q. In your experience in the coffee business, does a man who can control 5,000,000 pounds of private label coffee, does he have some security in the coffee business? By that I mean, is he a man that other companies would readily employ? A. Well, it is difficult to answer that because it would depend on whether or not the business was profitable. The private label is a very low profit business. Q. But I take it that it was profitable or you wouldn't have kept it? A. That's right, it helped cover our overhead expenses. Q. Right. And in 1958 when you bought the company, did you want Dana to come with you? A. Yes. Well, I'll put it this way, we would not have bought the company, really, had he not joined us. Q. Was this in some measure due also to the private label coffee business that he had established for the Manhattan Coffee Company by 1958? A. I would say it was not at that time. Q. Was it due to the Manhattan Label? A. It was due to the Manhattan brand, the franchise and the market.↩
8. The witness testified as follows: Q. Did the fact that, in your opinion, the safaris were more beneficial to Dana as an individual in the private label business, is that one of the factors that influenced your decision not to pay the expenses? A. My answer is, let me see if I can restate this, my answer is that I simply didn't feel that the safari expenditures were an expenditure that Manhattan should pay for. I felt that the expenditure that Dana made enhanced his position as a salesman and so forth. In other words, if we had had an option to spend $15,000 for the safari or to spend $15,000 for television time or something of that nature, I would have leaned toward spending it on some media like television or newspaper or radio. We had a fairly modest budget in those days.↩
9. The president of Cain during the time petitioner was with Manhattan, who was also at that time the chairman of the Board of Manhattan and in reality petitioner's immediate superior, testified in this regard as follows: Q. While Dana was paid a salary of $35,000, was this salary in any way related to his productivity in sales? A. Well, it was related insofar as we expected him to do an outstanding job. Q. If Dana had not been able to maintain the sales accomplishments that gave rise to the $35,000 salary, would he have been cut? A. Well, it's a little difficult to answer that. Q. Let's say that the sales dropped in half. Would he still have been paid $35,000? A. Let me answer it this way. If it had continued for any great length of time, why, then it would have been necessary to make an adjustment, I mean we wouldn't have just immediately. Q. I understand. But would it be fair to say that in the over-all picture, Dana's salary was put at $35,000 because it was felt that this was commensurate payment for his sales productivity? A. That's why we paid him. Q. And if his sales productivity had taken any substantial slump he would not therefore have been continued to be worth $35,000 to the company, is that correct? * * * A. I would say, I'll just repeat my answer. In other words, if his sales slump had continued for a period of two or three years or so, why, then we would have had to sit down and have a meeting of the minds on the subject, but just the first year, why, naturally we wouldn't. Q. I appreciate that, but what I'm really getting at is that you did expect some consistency of sales for this $35,000, did you not. A. That's right, we did. Q. While you may have tolerated some depletion of sales for one year, if it wasn't too serious, and maybe even for two years, the ultimate truth is that Dana's salary was pegged at this level in return for his anticipated production of sales? A. That's a fair statement. Q. And that a failure of his sales would mean that the reason for this level salary would no longer exist? A. I think that's right. Q. Would it be fair, therefore, to say that in order for Dana to continue to earn the $35,000, it was required of him to maintain this substantial sales productivity that he had done? A. Yes.↩