*Decision will be entered under Rule 50.*

WILLIAM C. STOLK AND EVE STOLK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 86839. Filed May 17, 1963

*Kenneth C. Quencer*, for the petitioners.
*Joseph Wilkes*, for the respondent.

HARRON, *Judge:* The Commissioner determined an income tax deficiency of $9,183.26 for 1955. The issues are (1) whether under section 1034(a), 1954 Code, gain from the sale of property is not to be recognized rather than recognized as long-term capital gain; (2) whether various expenses paid by petitioner, for which he did not claim reimbursement by the corporation of which he is an officer, are his ordinary and necessary business expenses under section 162(a).

### FINDINGS OF FACT

Some facts have been stipulated; they are so found and incorporated herein by reference.

The petitioner, William C. Stolk, filed a joint return with his wife with the district director of internal revenue for the district of Upper Manhattan, N.Y.

Petitioner is the chief executive officer and chairman of the board of directors of American Can Co. His office was and is in New York City.

Petitioner was the general manager of sales in 1941; vice president in 1942; executive vice president in 1949; president in April 1951; chief executive officer in 1952. He will be eligible to retire and plans retiring in August 1965.

Petitioner's family consisted of his wife and three daughters in 1953. By the early part of 1953, all of his daughters had married and had their own homes.

On July 19, 1955, petitioner and his then wife, Fern G. Stolk, entered into a separation agreement. Petitioner established a statutory residence in Reno, Nev., in order to obtain a divorce which was duly granted under a decree dated September 15, 1955. Thereafter, in 1955, petitioner and his present wife, Eve Stolk, were married.

## Issue 1. Real Estate Transactions

Petitioner owned residential property, a house and surrounding 5 acres of land, in Chappaqua, Westchester County, N.Y., near Mt. Kisco, a distant suburb of New York City. He bought the property in 1941 when the house was new. The cost of the entire property was $32,012. Petitioner added a screened porch which cost $250. The total cost basis of the property was $32,262.[1] From the time of purchase until the fall of 1950, this home was petitioner's only residence. He did not own any other residence until he purchased a substitute residence and a farm on September 1, 1955.

In the fall of 1950, petitioner leased a small apartment at 40 Park Avenue, New York City, so as to live closer to his office. His duties and work as a corporate executive had increased and he found it inconvenient to commute during the week to his suburban home. At that time, only one daughter was still living at home. During the week, petitioner and his family occupied the apartment. They spent weekends and holidays at Chappaqua. The apartment comprised two bedrooms, living-dining room, and kitchen; it was unfurnished; the rent was $300 a month. Petitioner carpeted and furnished the apartment. He did not take such furnishings out of the Chappaqua house. Petitioner occupied this apartment until the early part of 1953.

In early 1953, a larger penthouse apartment at 40 Park Avenue was available, consisting of living room, dining room, two bedrooms, and kitchen. The monthly rent was $600. Petitioner and his wife moved into this apartment in March or April 1953, and lived there until October 1955. At this time, petitioner decided to look for other resi-

---

[1] The respondent determined that the cost basis was $32,012. Petitioner established that there was an additional capital cost of $250.

dential property with a farm where he could carry on farming operations, to which he could retire in 1965.

In April or May 1953, while furniture was still in the house, petitioner listed the Chappaqua house for sale, but not for rent, with local real estate brokers. Within 2 days thereafter, he received a very attractive offer of purchase which he did not accept.

In May or June 1953, petitioner moved out of the Chappaqua house all of the furnishings with the then definite intention of not living there again or making any further use of the property. He intended to sell the property and use the proceeds in the purchase of other property in the country. He moved all of the furniture to a warehouse in Mount Vernon, N.Y., except personal effects and furniture for one bedroom which were moved to the city apartment. Petitioner kept the house heated to preserve the walls and keep it in generally good condition, and paid taxes. After moving out, neither petitioner nor any member of his family made any use of any part of the property. It remained vacant until it was sold on July 29, 1955. The property was not offered for rent or rented at any time; it was not converted to any trade or business use, or held for the production of income.

The furniture in the Chappaqua house was insured for $60,000. Exclusive thereof, petitioner paid about $2,500 for the furnishings used in his rented apartment in the city.

On July 29, 1955, petitioner sold the Chappaqua house and 1½ acres for the net amount, after expenses, of $51,940. On September 30, 1955, he sold the remaining 3½ acres for the net amount of $6,864. He received the total net amount of $58,804. Respondent agrees that the entire property constituted one unit of residential property and does not make any issue of the fact that the property was disposed of in two transactions.

In October 1955, petitioner moved from 40 Park Avenue to 521 Park Avenue, New York City. In his return for 1955, he gave 521 Park Avenue as his home address. This apartment consisted of living room, one bedroom and dressing room, and kitchenette.

In October 1961, petitioner moved to Manhattan House, 200 East 66th Street, New York City, where he and his wife have resided continuously since then. This apartment consists of a combination living room and dining room, one bedroom, and kitchen.

During 2 years, in his spare time, from the spring of 1953 until the summer of 1955, petitioner looked at farm properties in New York, Pennsylvania, West Virginia, Virginia, and other nearby States. He looked at 64 properties and bought the 64th.

On September 1, 1955, petitioner purchased 446.25 acres of land with various improvements, called Hampstead Farm, located in Esmont, Va., 20 miles from Charlottesville. It is 427 miles from New York City, one way; 854 miles round trip. He renamed the property

Eden Farm. Of the entire property, 5 acres represent the residence area with a house having about eight rooms and two bathrooms, a two-room-and-bath guest cottage, a servant's cottage, garage, and old icehouse. One-half of a pumphouse and horse barn are allocated to the residence. The remaining 441.25 acres include 300 acres of open farmland and 141.25 acres of woodland. The farm area improvements include a tenant dwelling, silo, cow and hay barn, horse barn, pumphouse, tool repair building, machine shed, utility structures, water lines, boundary and cross fences, and interior roads. Prior to petitioner's purchase, the farm was a working farm where beef cattle, hay, and grain were raised.

In October 1955, petitioner moved his principal furniture from the warehouse in New York and some furniture from his city apartment to the Eden Farm residence, which was in habitable condition. However, he did some remodeling and improving of the main residence and guest cottage within 1 year after selling the Chappaqua property.

Also, petitioner began farming operations in 1955 on 147 acres and purchased Black Angus cattle, horses, and farm equipment. He hired a tenant farmer and three field hands. He has continued his farming operations and now has about 250 head of cattle. Petitioner regards the farm operation as a business and reported it as such in his 1955 return.

During the last 4 months of 1955, and thereafter, petitioner and his wife went from New York City to Eden farm during weekends and holidays. During these visits they occupied and lived in the main dwelling house. Petitioner's wife has not lived continuously at Eden Farm; she lives in the New York apartment during the week and makes the round trip to the farm with petitioner during weekends. During the last 4 months of 1955, petitioner and his wife spent about 13 weekends at Eden Farm. They usually left New York on Friday and returned on Sunday. On about three occasions they left New York on Wednesday or Thursday and returned on Monday or Tuesday. In 1956, petitioner and his wife spent weekends and holidays at Eden Farm. Petitioner joined Farmington Country Club in Charlottesville.

For 1955 and 1956, petitioner filed resident New York State income tax returns and nonresident Virginia State income tax returns. He maintains two checking accounts and a safe-deposit box in New York, and one checking account in Virginia.

Petitioner voted in New York in 1960, as a resident of New York. He did not vote in any election anywhere in 1955; he did not vote in 1956 in the national election.

Within 1 year after the purchase of Eden Farm, petitioner spent $12,493.90 in the course of remodeling the house and guest cottage.

Of this sum, $11,186.59 was spent for improvements of a capital nature which properly is to be added to cost basis.

Petitioner purchased the entire Eden Farm property for $116,009.14. The parties have stipulated that of this amount, $46,009.14 is the portion allocable to the purchase of the residence and related 5 acres. The total cost of the new residence, including the cost of capital improvements, was $57,195.73. Since petitioner received from the sale of the Chappaqua property the net amount of $58,804, and the total cost of the Eden Farm residence was $57,195.73, there was not reinvested in the new residence $1,608.27 of the proceeds from the sale of the old residence.

The following are stipulated: (1) The allocable parts of the expense of acquiring Eden Farm are $259.14 for the residence, and $750 for the farm; total, $1,009.14. (2) The unadjusted cost basis of the various farm structures, water lines, fences, and roads is $41,000, which is to be depreciated over a useful life of 25 years; for 1955, depreciation on that basis is allowable for one-third of a year, or 4 months. (3) Repairs made by petitioner to the tenant farmer's cottage costing $2,744.18 are to be capitalized and depreciated over a useful life of 10 years; for 1955 the allowable depreciation on that basis is one-fourth of a year, or 3 months.

When petitioner moved out of the Chappaqua house in the spring of 1953 with the intention of not returning and of not using the property again as a residence or for any other purpose, he then abandoned the property as his residence and it was not thereafter used as his principal residence. The Chappaqua house was not his principal residence at the time it was sold in July 1955, or during the period following the date when he moved out in 1953.

Petitioner's occupancy and use of the Eden Farm residence during weekends and holidays did not constitute using that residence as his principal residence within a period of 1 year after the sale of the Chappaqua property.

Beginning in May or June 1953, petitioner's principal residence was the apartment which he occupied in New York City, and a New York apartment has continued to be used as his principal residence continuously thereafter up to the present time.

## Issue 2. Expenses

American Can Co., at all times material, has followed the practice of receiving expense account statements and claims for reimbursement from its officers and other employees for allowable expenses incurred and paid by them in connection with the conduct of its business, and upon audit, it reimburses them for allowable business expenditures. During 1955, petitioner submitted to the company such regular expense account statements, the nature and amounts of which are

disclosed, under which he received reimbursement of business expenses.

During 1955, petitioner voluntarily incurred and paid additional expenses which it is claimed aggregated $1,789.33; $1,690.78 for entertainment and gifts, and $98.55 for taxicabs. It is claimed, also, that none of this expense was included in any expense account submitted to the company by petitioner and that no part was reimbursed. Some of the entertainment expenditures were for dinner parties and similar entertainment in Caracas, Nassau, and Puerto Rico while petitioner was otherwise on corporation business trips away from the United States and, also, in Los Angeles, San Francisco, Reno, and New York City. Nevertheless, they were not included in any of petitioner's expense account statements which were presented to the corporation, for which petitioner received reimbursement. The taxicab expenses were incurred in New York City in connection with the corporation's business, were its business expense, and would have been reimbursed if petitioner had submitted expense accounts for them or included them in expense accounts, which he failed to do.

The corporation did not expect or require petitioner to incur and pay from his own funds any of the expenses in question or, in general, any expenses other than those for which it would ordinarily reimburse him under regular expense account claims. None of the claimed expenses in the amount of $1,789.33 was ordinary and necessary business expense of petitioner in earning his salary and carrying on his executive duties; all were personal expenses.

OPINION

### Issue 1. Real Estate Transactions

The issue is whether the gain from the sale of the Chappaqua property is not to be recognized in the year of the sale under section 1034(a), 1954 Code.[2] The dispute involves two aspects of the statute: First, whether the Chappaqua property was used by petitioner as his principal residence and, second, whether within 1 year after the date of the sale of the Chappaqua property, part of Eden Farm was used by petitioner as his principal residence.

With respect to each property, petitioner's *use* thereof is determinative. His *use* must be equated with the statutory requirement of "principal residence."

---

[2] SEC. 1034. SALE OR EXCHANGE OF RESIDENCE.

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

Respondent's primary contention is that petitioner abandoned the Chappaqua property as a residence at least 2 years before its sale, thereby disqualifying that property as one "used by the taxpayer as his principal residence," and that when he abandoned the property, an apartment in New York City became and continued to be petitioner's principal residence.

The question whether or not a taxpayer has abandoned property as a residence prior to its sale is one of first impression under section 1034(a).

The words of a statute are to be given their ordinary meaning. *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552; *Helvering* v. *San Joaquin Co.*, 297 U.S. 496; *Helvering* v. *Flaccus Leather Co.*, 313 U.S. 247. The construction of a statute should be in harmony with the statute "as an organic whole." *Lewyt Corp.* v. *Commissioner*, 349 U.S. 237. The context in which a word occurs and the purpose of the statute in which it is employed indicate its meaning.

The ordinary meaning of "use," principal," and "residence" is clear and well understood, but if dictionary definitions are helpful in recalling the common meanings (see Webster's Unabridged Third New International Dictionary), use (the verb) means a "putting to service of a thing"; principal means "chief or main"; and residence means "the place where one actually lives or has his home." The context in which "used" occurs, referring to the "old residence," connects "used" with the taxpayer's "principal residence," thereby making it clear that the property which is sold shall be utilized as the principal residence.

Petitioner did not use the Chappaqua property for 2 years prior to its sale. The place where he actually lived and had his home was an apartment in New York City during the period in which the Chappaqua house was vacant, and from about May 1953 until July 29, 1955, at least, the apartment was his principal residence. Moreover, petitioner admits that he intended, when he moved everything out of the Chappaqua house into storage, never to return there to live and not to make any further use of that property. Furthermore, shortly before moving all of his possessions out of the Chappaqua house, petitioner moved into a more attractive apartment at 40 Park Avenue for which the rent was $600 a month, twice the amount of the rent of the first apartment leased in the same building. Taken together, petitioner's actions at about the same time of moving into another apartment and moving out of the Chappaqua house with the intention of not returning to live there again constituted an abandonment of the Chappaqua house as petitioner's principal residence.

Petitioner contends that for the purpose of section 1034(a), the Chappaqua house was his principal residence because it had been

so used beginning in 1941, and because he alleges that he regarded the city apartment as a temporary residence pending his acquisition of property to replace the Chappaqua property. His explanations for leaving the Chappaqua house vacant are that he found it more convenient to live in the city apartment while he looked for replacement property which would be suitable for both a residence and a farm, and that although he diligently searched for the new property, it required his leisure time during 2 years to locate new property which satisfied his requirements, which he finally purchased. He also asserts that the Chappaqua property was continuously offered for sale during the 2 years when it was vacant.

With respect to the latter assertion, the record is silent. Petitioner did not present evidence relating to what efforts were diligently made during 2 years to sell the property, if any were in fact made, other than that he received and rejected one good offer of purchase 2 days after the property was put on the market for sale in April or May 1953. Lacking some explanation of why the Chappaqua property was held as vacant property for 2 years, and taking into account the closeness in the timing of the sale of the old property, on July 29, 1955, and the purchase of the new property, on September 1, 1955, there is a strong implication under all of the circumstances that petitioner did not strenuously try to sell the Chappaqua property until he had located the Virginia property and had obtained a commitment of the seller to sell it to him. His arrangements may have been made with the provisions of section 1034(a) in mind, so as to be sure that the purchase of the Virginia property would be completed within a period of 1 year after the date of the sale of the New York property. But however it may have been, petitioner's explanations about putting the New York property on the market for sale in 1953, and deciding to look for a piece of farming and residential property before he did so, and about the length of time spent in finding the new property do not serve to establish that the Chappaqua property was not abandoned as and remained his principal residence within the meaning of section 1034(a). The facts that petitioner wanted to sell the property and seriously searched for 2 years before he found suitable property in Virginia merely explain why the Chappaqua property was vacant for 2 years, but these explanations do not negate the fact that the Chappaqua property was not used and was abandoned as a residence 2 years before it was sold. The provisions of section 1034(a) do not provide and the legislative history thereof does not indicate that the stated relief will be allowable if there is a reasonable cause for not using the old property as a principal residence.

Since the words of a statute are to be given their ordinary meaning, it is pertinent to consider the relevant legal meaning of the term residence—how it is acquired and how it is lost.

In *Dwyer* v. *Matson*, 163 F. 2d 299, 302 (C.A. 10), citing *Shaeffer* v. *Gilbert*, 73 Md. 66, 20 Atl. 434, 435, a well-accepted definition of residence as distinguished from domicile is as follows:

It [residence] does not mean * * * one's permanent place of abode, where he intends to live all his days, or for an indefinite or unlimited time; nor does it mean one's residence for a temporary purpose, with the intention of returning to his former residence when that purpose has been accomplished, but means, * * * one's actual home, * * * whether he intends to reside there permanently, or for a definite or indefinite length of time.

The elements of residence are the fact of abode and the intention of remaining, and the concept of residence is made up of a combination of acts and intention. Neither bodily presence alone nor intention alone will suffice to create a residence. 77 C.J.S. Residence, p. 295; *Petition of McLauchlan*, 1 F. 2d 5, 7 (C.A. 1). In the case of *In Re Garneau*, 127 F. 677, 679, the court said:

Residence has been defined to be a place where a person's habitation is fixed, without any present intention of removing therefrom. It is lost by leaving the place where one has acquired a permanent home and removing to another place animo non revertendi, * * *

Applying the above tests to the facts here, it follows that petitioner's moving out of the Chappaqua house with the intention at the time of moving of not again living there constituted abandonment of that property as a residence.

Section 1034(a) provides that the old property must be used as the taxpayer's principal residence. In the absence of such use the statute does not apply and the nonrecognition-of-gain relief must be denied. *Biltmore Homes, Inc.* v. *Commissioner*, 288 F. 2d 336, 342, affirming a Memorandum Opinion of this Court. Having moved into a leased apartment with the intention of living and making his home there for an indefinite length of time, the Chappaqua residence ceased to be petitioner's residence when he moved out.

Relying upon *Ralph L. Trisko*, 29 T.C. 515, petitioner contends that the relief afforded by section 1034(a) may not be denied merely because the taxpayer is not living in the old residence at the time of its sale. The *Trisko* case is distinguishable. Also, this Court (p. 520) strictly limited the decision there to the facts of that case.

In the *Trisko* case (p. 519), the Commissioner determined that the taxpayer held and used his residence as income-producing real estate; therefore, he was not entitled to the relief allowed by section 112(n) of the 1939 Code, the predecessor of section 1034(a). It is evident that the chief basis for the Commissioner's determination was the distinction made in the committee reports which accompanied the bill which became the Revenue Act of 1951 (section 318(a) of which added section 112(n), which states that "The term 'residence' is used in contradistinction to property used in a trade or business and property

held for the production of income"). The relevant part of the committee reports (which are reprinted in 1951–2 C.B. 309, 436, and 483) is set forth below.[3] This Court concluded from the evidence that Trisko was not holding and using his residence for the production of income but had leased it during a temporary absence while he was employed abroad in order to provide for its care and maintenance, and that under all of the facts and circumstances the property in question, which was sold, was used by Trisko as a residence in contradistinction to property held for the production of income. In so concluding, the Court indicated that the facts and circumstances in the *Trisko* case were for practical purposes within the provision in the Commissioner's regulations which states that "The mere fact that property is, or has been, rented is not determinative that such property is not used by the taxpayer as his principal residence." See sec. 1.1034–1(c)(3), Income Tax Regs.; and Rev. Rul. 59–72, 1959–1 C.B. 203. The Court found, also (p. 516), that Trisko "intended at all times while away from his residence to return to it as soon as his employment made it possible," and that the residence was not on the market for sale.

The *Trisko* case involved the circumstance that the taxpayer was not occupying his old residence at the time of its sale, but neither the reasoning nor the holding there made stands for the broad construction which petitioner seeks, that a taxpayer is not required to physically occupy his old residence at the time of its sale. The seemingly broad statement in *John F. Bayley*, 35 T.C. 288, 296, to that effect cannot properly be so understood in the light of the findings and reasoning of the *Trisko* case, and obviously such broad statement was made in the course of and for the purpose of pointing out the statutory requirement that "a new residence must be lived in or physically occupied, on or prior to the postsale deadline date" (p. 297). In the *Bayley* case (p. 296) it was said that in the *Trisko* case "this Court held that the taxpayer was not required to physically occupy his *old* residence at the time of the sale thereof." But, the Court specifically limited its statement to what the holding was in that case. The *Trisko* case did not present the precise question which is at issue here and it is distinguishable on its facts.

---

[3] Whether or not property is used by the taxpayer as his residence, and whether or not property is used by the taxpayer as his principal residence (in the case of a taxpayer using more than one place of residence), depends upon all of the facts and circumstances in each individual case, including the bona fides of the taxpayer. The term "residence" is used in contradistinction to property used in trade or business and property held for the production of income. Nevertheless, the mere fact that the taxpayer temporarily rents out either the old or the new residence may not, in the light of all of the facts and circumstances in the case, prevent the gain from being not recognized. For example, if the taxpayer purchases his new residence before he sells his old residence, the fact that he rents out the new residence during the period before he vacates the old residence will not prevent the application of this subsection. [H. Rept. No. 586, 82d Cong., 1st Sess. p. 109, (1951); S. Rept. No. 781 (Supp.), 82d Cong., 1st Sess. p. 32, (1951).]

In the committee reports relating to section 318(a) of the 1951 Act (sec. 112(n), 1939 Code), *supra* (which contain the main indication of the congressional intent), it is noted that the statute carries over the similar treatment which "is available under existing law under the involuntary-conversion provisions of section 112(f)," such as when a home is destroyed by fire or lost by the exercise of the powers of condemnation and the proceeds recovered by the taxpayer are invested in a replacement residence. See report of the Joint Committee Staff, 1951–2 C.B. 309. In this and the other committee reports it is stated that "the mere fact that the taxpayer temporarily rents out either the old or the new residence may not, in the light of all of the facts and circumstances in the case, prevent the gain [from the sale of the old residence] from being not recognized." Report of the Ways and Means Committee, 1951–2 C.B. 436. It is in connection with this circumstance of a temporary renting out of the old residence that there appears the further explanation that "The taxpayer is not required to have actually been occupying his old residence on the date of its sale." Report of the Joint Committee Staff, 1951–2 C.B. 309. The foregoing statement clearly was limited to the possible situation where the taxpayer temporarily rented out his old residence before its sale, having acquired and moved into his new residence within the statutory period of 1 year before the date of the sale of the old residence; or was limited to a similar situation. The facts and circumstances in the instant case, where the taxpayer moved out of his old residence 2 years before its sale and before the purchase of the new property, are substantially different from the examples given in the committee reports and do not come within the congressional intent indicated by those reports.

The phrase "used by the taxpayer as his principal residence" means habitual use of the old residence as the principal residence. The antithesis is nonuse of property as the principal residence.

It is held that the Chappaqua property was not used as petitioner's principal residence and that his city apartment was used as his principal residence at the time of the sale of the Chappaqua property and during a period of 2 years prior to the sale; the Chappaqua property does not qualify under section 1034(a) and the gain from its sale must be recognized in the year of the sale.

This holding is dispositive of the issue because in order to obtain the relief afforded by the statute, all of the prescribed conditions must be satisfied. Although it is unnecessary to decide the remaining questions, in this instance we do so.

The statute requires that the new residence must be used as the taxpayer's principal residence within 1 year from the date of the sale of the old one. The question is which was used as petitioner's principal residence during the postsale period, the Eden Farm residence or the

New York apartment? In order to meet the prescribed requirement, the taxpayer must prove that the new property was his *principal* residence. It is not enough to establish that he occupied and used the new property as a residence. It is true that petitioner moved his chief household furnishings into the main dwelling house at Eden Farm within 3 months after it was purchased; that the main dwelling there was in condition to be lived in; and that petitioner and his wife lived there during weekends and holidays in 1955 and 1956, within the 1-year postsale period. But such use and occupancy was not sufficient to constitute Eden Farm as petitioner's principal residence during the 1-year period involved. Petitioner and his wife made a round trip of 854 miles in order to make short visits to Eden Farm from New York City where petitioner's chief occupation required his presence during most of each week. The apartment in New York was where he lived and made his home in the ordinary and customary meaning of the term "principal residence." It was the home to which he returned from business and vacation trips, which was his address for voting purposes, and where he has intended to live for a period of several years until he is eligible to retire from his chief occupation in August 1965, which will be about 10 years after the time of the purchase of Eden Farm. That petitioner's chief household furnishings were moved to Eden Farm in 1955 and that he regularly spent weekends and holidays there do not establish that it was his principal residence within the statutory period. It is held that the city apartment was petitioner's principal residence in 1955 and 1956 during a period of 1 year, at least, after the sale of the Chappaqua property.

Evidence was introduced relating to the cost of the Chappaqua property, and petitioner's expenditures in purchasing and making improvements at Eden Farm. We find and conclude that the cost of the old property was $32,262; and that $11,186.59 was spent for improvements of a capital nature at Eden Farm out of the proceeds from the sale of the old property, which are properly added to basis.

## Issue 2. Expenses

Petitioner would have received reimbursement for taxicab charges of $98.55, incurred in New York City in connection with the company's business, if he had claimed it. It was not necessary for him to remain unreimbursed. These charges were business expenses of the company and petitioner cannot convert its business expenses into his own by failing to claim repayment, even though paid by him. Deduction is not allowable. *Hal E. Roach*, 20 B.T.A. 919, 925; *Horace E. Podems*, 24 T.C. 21, 23; *Heidt* v. *Commissioner*, 274 F. 2d 25 (C.A. 7), affirming a Memorandum Opinion of this Court; *Burnet* v. *Clark*, 287 U.S. 410; *Deputy* v. *du Pont*, 308 U.S. 488, 493–494.

Petitioner was required to prove the nature and amount of each item of entertainment and gift expense totaling $1,690.78, and that each item was proximately related to his business of earning his income and was ordinary and necessary expense, was not personal, and was not reimbursed. He failed in his burden of proof. He did not produce original, detailed records made at the time of each expenditure. The diary in which he claims he made such record was not produced although it is existent. His testimony was vague, general, and replete with self-serving conclusions. It is not adequate to discharge his burden of proof. Neither was his general tabulation of overall totals for various classes of alleged expense. The record confirms petitioner's belief that none properly could be charged to the corporation as its ordinary and necessary business expense. "It is not enough that there may be some remote or incidental connection" with the conduct of a business. *Ralph E. Larrabee*, 33 T.C. 838, 843; *Richard A. Sutter*, 21 T.C. 170; *Henry Cartan*, 30 T.C. 308; *Eugene H. Walet, Jr.*, 31 T.C. 461, affd. 272 F. 2d 694 (C.A. 5); *Reginald G. Hearn*, 36 T.C. 672, affd. 309 F. 2d 431 (C.A. 9).

All of the expenses were of a social nature. Almost all those entertained and given gifts did not have any present or potential business relations with the corporation; no business of the company was discussed or promoted. Petitioner's claim for a deduction is based chiefly on his contention that he made the expenditures only because he was one of the chief company officers and believed they created goodwill. This case closely resembles *Noland* v. *Commissioner*, 269 F. 2d 108 (C.A. 8), affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 885. The reasoning there applies equally well here. Petitioner failed to prove that as part of his duties the corporation expected or required him to assume and pay from his own funds any of the disputed expenses, without repayment. The corporation followed a policy of reimbursing its officers for direct expenses in furthering its business. Since it did not reimburse petitioner, the expenses were prima facie personal expenses either because they were voluntarily assumed or did not arise directly out of the exigencies of the corporation's business. *Noland* v. *Commissioner, supra*. Petitioner failed to overcome this prima facie nature of the expenses as well as the prima facie correctness of respondent's determination. Expenses of social obligations of a person holding a responsible executive position ordinarily are not his ordinary and necessary business expenses and petitioner has not proved the contrary. The deduction is not allowable. *Welch* v. *Helvering*, 290 U.S. 111; *Commissioner* v. *Flowers*, 326 U.S. 465; *Andrew Jergens*, 17 T.C. 806, 811; *Jacob M. Kaplan*, 21 T.C. 134, 145.

Recomputation of the deficiency is necessary chiefly because certain agreed adjustments are to be made which relate to other items.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

358

FAY, *J.*, dissenting: I respectfully disagree with the majority opinion which holds that the petitioner is not entitled to avail himself of the provisions of section 1034(a) of the Internal Revenue Code of 1954. My dissent is predicated on the belief that the majority has not only misinterpreted the language of section 1034(a) but has erred with regard to its ultimate findings of fact.

The majority opinion is based on the erroneous premise that section 1034(a) is applicable only when the property sold is the principal residence of the taxpayer at the time of the sale. This premise, however, is not supported by the language of the statute, nor can it be explained by resorting to the legislative history of section 1034. The statute itself merely states, in effect, that—

If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property * * * is purchased and used by the taxpayer as his principal residence, gain (if any) * * * shall be recognized only to the extent that the taxpayer's adjusted sales price * * * of the old residence exceeds the taxpayer's cost of purchasing the new residence.

Section 1034 was intended by Congress to be a relief measure, and as such I believe it is the obligation of the courts, in the absence of a congressional expression to the contrary, to construe such legislation with a view toward liberality. Since the statute itself imposes no restrictions on the word "used," I believe this Court, under the circumstances of this case, should likewise decline to do so.

In the instant case, there is no dispute that the Chappaqua property was used at least until 1950 as petitioner's principal residence. Such being the case, there appears to be no reason why petitioner should be denied the benefits of section 1034.

However, even if the majority is correct in its construction of the word "used" in the statute, I am of the opinion that the Chappaqua property was petitioner's principal residence at the time of the sale. The issue here centers on whether petitioner actually abandoned Chappaqua as his principal residence in 1953. The majority's finding that petitioner did abandon Chappaqua as his principal residence in 1953 stems by and large from the fact that petitioner at that time removed his furniture having an insured value of $60,000 from Chappaqua. The fact that petitioner removed his furniture does not, under the circumstances of this case, constitute an act of abandonment of a residence. Since the furniture was extremely valuable and petitioner was now living full time in a rented apartment in New York City, it would not be unreasonable for petitioner to seek to protect the furnishings of his house against the risks of fire, theft, etc., which are more likely to occur when premises are unoccupied for periods of time. Furthermore, considering that petitioner refused to sell his Chappaqua property until he could find and purchase a suitable farm

and that he refused to integrate his Chappaqua furniture, except for one-bedroom suite, into the New York City apartment, it would seem that petitioner's contention that the New York apartment he rented was only a temporary residence and that Chappaqua was his principal residence is supported by the record. The fact that petitioner was not actually living in Chappaqua at the time of its sale does not bar the use of section 1034. See *Ralph L. Trisko*, 29 T.C. 515, 519 (1957).

The majority also concluded that the "new residence" was not used by petitioner as his principal residence. Considering the petitioner's reasons for renting and maintaining the New York apartment, the nature of the apartment in view of petitioner's income and position, the circumstances surrounding the acquisition of the farm, the reasons for its acquisition, the furnishing of it with the Chappaqua furniture and the fact that petitioner and his wife traveled to the farm every weekend and holiday, it would appear that the finding of the majority is contrary to the facts revealed by the record.

WITHEY, DRENNEN, and DAWSON, *JJ.*, agree with this dissent.