ROBERT G. CLAPHAM AND JOAN D. CLAPHAM, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2733-73, 2734-73.    Filed January 30, 1975.

Robert G. Clapham, pro se.
*Alan R. Herson,* for the respondent.

OPINION

WILBUR, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes for the year 1969:

| | |
|---|---|
| Robert G. Clapham _____ | $899.21 |
| Joan D. Clapham _____ | 361.01 |

Due to concessions made, the only issue for decision is whether the Commissioner erred in determining that the sale of a house by petitioners did not qualify as a sale of petitioners' principal residence subject to the nonrecognition provisions of section 1034 of the Internal Revenue Code of 1954.[1]

All of the facts have been stipulated and are incorporated herein by this reference along with the accompanying exhibits.

Petitioners Robert G. and Joan D. Clapham were residents of Altadena, Calif., at the time they filed their petitions in this case. Each petitioner filed a separate Federal income tax return for the year 1969 on the cash basis of accounting with the internal revenue service center, Ogden, Utah.

In 1966, petitioner Robert G. Clapham was employed by a certified public accounting firm in the San Francisco area. In April of 1966, the firm decided to open an office in Los Angeles, Calif. In anticipation of the move to Los Angeles, from May 1966 until August 15, 1966, petitioners attempted to sell their house at 470 Green Glen Way, Mill Valley, Calif. On August 15, 1966, petitioners moved to the Los Angeles suburb of Altadena. At the same time, they listed the Mill Valley house for sale with a real estate broker; the house was left vacant to facilitate its sale. Petitioners at no time intended to return to the Mill Valley house, and had no plans for it other than to dispose of it as soon as an offer was received.

In the spring of 1967, petitioners received an offer to lease the house with an option to purchase. Although petitioners' primary wish was to sell the house, financial circumstances dictated acceptance of the offer.

In the spring of 1968, the party who had leased the house moved out without exercising the option to purchase. Efforts to sell the house were resumed, and it was again left vacant to facilitate its sale.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

From August 1966 until September 1968, petitioners had rented a house in Altadena because they had not disposed of the Mill Valley house. In September 1968, petitioners purchased a house in Altadena for $31,500, plus closing costs.

In the fall of 1968, financial circumstances again dictated acceptance of an offer to rent the Mill Valley house, and in December of 1968, the house was again vacated.

In June of 1969, the house was sold for $32,000, less closing costs. The basis of the house at the time of the sale was $26,453. From August 15, 1966, until the time of the sale, petitioners had received no offers from anyone desiring to purchase the house.

On their separate Federal income tax returns for 1969, petitioners did not include in gross income the gain from the sale of the Mill Valley house, but reduced the basis of the Altadena house by an amount equal to the amount of the gain not recognized on the sale of the Mill Valley house. In his notices of deficiency, respondent determined that petitioners must include in gross income for 1969 the gain realized on the sale of their Mill Valley house.

The only issue presented is whether the gain on the sale of petitioners' Mill Valley home qualifies for the nonrecognition treatment afforded by section 1034. This section provides that when a taxpayer sells his principal residence and purchases a substitute within a period beginning 1 year before and ending 1 year after the sale of his old residence, gain is recognized only to the extent the adjusted sales price of the old residence exceeds the taxpayer's cost of purchasing the new residence.[2]

Respondent concedes that the purchase of the new residence was followed by the sale of the old residence within the 1-year period required by the statute. Respondent has nevertheless denied petitioners the benefits of section 1034, contending that in leaving their Mill Valley residence with no intention of returning, the petitioners "abandoned" it as their principal residence, and it ceased to be their principal residence when it

---

[2] Sec. 1034(a) reads:

SEC. 1034. SALE OR EXCHANGE OF RESIDENCE.

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

was sold several years later. In support of his position respondent cites *William C. Stolk,* 40 T.C. 345 (1963), affirmed per curiam 326 F. 2d 760 (C.A. 2, 1964), and *Richard T. Houlette,* 48 T.C. 350 (1967). Respondent misinterprets these cases. Both *Stolk* and *Houlette* make it clear that whether or not property is the principal residence of the taxpayer depends on all the facts and circumstances in each individual case. *William C. Stolk, supra* at 354; *Richard T. Houlette, supra* at 354, 355. Accord, *Ralph L. Trisko,* 29 T.C. 515, 519 (1957); *John F. Bayley,* 35 T.C. 288, 295, 296 (1960); *Robert W. Aagaard,* 56 T.C. 191, 202 (1971).[3] *Stolk* and *Houlette* must be considered in this light.

In *Stolk* the taxpayer rented an apartment in New York City in the fall of 1950 where he resided during the week with his family, spending weekends at his home in Chappaqua, N.Y. It was not until the middle of 1953 that the taxpayer vacated his Chappaqua residence and listed it for sale. Similarly, after selling his Chappaqua residence in 1955 and replacing it with a farm in Virginia, the taxpayer continued to spend the weeks in his apartment in New York City, while spending most weekends in Virginia.

Thus, the taxpayer in *Stolk* had two residences, both before moving out of his Chappaqua, N.Y., residence, and after acquiring his Virginia farm. Although he sought to qualify his Chappaqua, N.Y., residence and his Virginia residence as principal residences invoking the nonrecognition provisions of the statute, we concluded that his principal residence was his apartment in New York City where he worked and resided with his family during the week, and he therefore was not entitled to the benefits of the statute.

It is true that there is language in the *Stolk* opinion indicating that when the taxpayer completely moved out of his Chappaqua residence with no intention to return, he abandoned it as his principal residence. But in the particular facts and circumstances of *Stolk,* where the taxpayer had two residences, the absence of an intent to return was simply one factor that, when added to the taxpayer's practice of working and living in New York City with his family during the week, demonstrated that his New York City apartment was his principal residence. The term

---

[3] See also sec. 1.1034-1(c) (3), Income Tax Regs.; H. Rept. No. 586, to accompany H.R. 4473 (Pub.L. No. 183), 82d Cong., 1st Sess., p. 109 (1951); S. Rept. No. 781 (Part 2), 82d Cong., 1st Sess., p. 32 (1951).

"abandoned," while perhaps an unfortunate choice of words, simply described the end result of a pattern of conduct clearly demonstrating that the taxpayer's principal residence was in New York City.

In *Houlette* the taxpayer lived in his home 1 year before being transferred. The home was then leased on five separate occasions over nearly 6 years. The first and last leases were for 2-year periods, none of the leases were with options to buy, and sales efforts were confined to periods contemporaneous with the expiration of a lease. In distinguishing *Ralph L. Trisko, supra, Houlette* states:

In *Trisko,* we concluded from the evidence that the taxpayer was not holding and using his residence for the production of income but had leased it during a temporary absence while he was employed abroad in order to provide for its care and maintenance. In the present case petitioner apparently rented the house after sales efforts failed because he could not get his asking price; we cannot say without more evidence that this was not a business purpose in light of petitioner's apparent intention not to occupy the house again. [ 48 T.C. 350, 355-356.]

In view of the facts and circumstances presented in *Houlette,* the decision must rest on this ground. *Houlette* admittedly includes very broad language discussing the relevance of nonoccupancy of the old residence, and the lack of intention to return. This only recognizes that a clearly manifested intent to return and reoccupy the premises may, in the light of all the facts and circumstances, negate a business purpose. *Robert L. Trisko, supra.* [4]

*Stolk* and *Houlette* do not establish a rule of law, but merely identify facts and circumstances deemed relevant in those cases. Understood in this light, they are not incompatible with other precedents clearly demonstrating that the taxpayer need not occupy the former residence when sold, and may temporarily rent the former residence. *John F. Bayley, supra,* and *Robert W.*

---

[4] *Houlette* also states that:

"the facts and circumstances must be exceptional and unusual to permit the conclusion that a principal residence is being used by the taxpayer at the time of sale if he is not in possession thereof and occupying same at that time. * * * [ 48 T.C. 350, 354.]"

While not free from ambiguity, we interpret this to simply mean that multiple rentals (with sales efforts confined to the time leases were renewed) for nearly 6 years must be accompanied by exceptional and unusual circumstances (like *Trisko*) to avoid a conclusion that the house is being held for business purposes. Additionally, *Houlette,* like *Stolk,* does state that the taxpayer "abandoned" his old residence. While, as in *Stolk,* this may be an unfortunate choice of words, it simply describes the end result of the taxpayer's rentals for nearly 6 years: that he held the property for business purposes rather than as his residence.

*Aagaard, supra.* Indeed, *Aagaard,* decided after *Stolk* and *Houlette,* states:

there is no requirement that the taxpayer actually occupy the putative old residence at the time of its sale. * * * Furthermore, the circumstances of the temporary renting out of the old or new residence will not necessarily prevent the application of section 1034(a). * * * [ 56 T.C. 191, 202.] [5]

In *Aagaard,* the taxpayer rented his old residence briefly prior to sale after vacating with no intention of returning. *Aagaard* therefore makes it clear that an intention to return is not always one of the relevant facts and circumstances to be considered.[6]

Under the facts and circumstances before us we do not believe the failure of petitioners to occupy their home or the absence of an intention to return is of any significance.[7] They vacated their old residence with no intention of returning, wishing only to sell the property as soon as a reasonable offer could be obtained. When a reasonable offer was not forthcoming, financial circumstances required them to rent the property temporarily pending sale, although their primary wish was always to sell.

Congress clearly intended that an individual could under appropriate "facts and circumstances" lease either his old or his new residence for a "temporary" period consistent with section 1034.[8] The difficult issue is what Congress meant by the word "temporary," and what "facts and circumstances" were contemplated. This issue must be resolved in the light of the congressional purpose underlying section 1034 as illuminated by the legislative history.

[5] "The taxpayer is not required to have actually been occupying his old residence on the date of sale. Relief will be available even though the taxpayer moved into his new residence and rented the old one temporarily before its sale. Similarly, he may obtain relief even though he rents out his new residence temporarily before occupying it." H. Rept. No. 586, 82d Cong., 1st Sess., p. 28 (1951); S. Rept. No. 781 (Part 2), 82d Cong., 1st Sess., p. 36 (1951).

[6] Indeed, in the typical situation, the taxpayer will list his property for sale in order to acquire funds to buy a new residence at his new place of employment. Although the sales efforts demonstrate the individual has no intention of returning, Congress framed the relief to apply in this situation, and can hardly have expected the taxpayers' nonoccupancy (or lack of intent to reoccupy) to be a "fact and circumstance" making the relief inapplicable.

[7] As noted, each case under sec. 1034 turns on the facts and circumstances presented, and this is not to say that under a different pattern of facts than here presented an intention to return, or the absence thereof, would not be significant.

[8] "The term 'residence' is used in contradistinction to property used in trade or business and property held for the production of income. Nevertheless, the mere fact that the taxpayer *temporarily* rents out either the old or the new residence may not, in the light of all the *facts and circumstances* in the case, prevent the gain from being not recognized." H. Rept. No. 586, 82d Cong., 1st Sess., p. 109 (1951); S. Rept. No. 781 (Part 2), 82d Cong., 1st Sess., p. 32 (1951). (Emphasis supplied.)

Section 1034 was added to the Code by section 318 of the Revenue Act of 1951. The rationale for this remedial provision was explained in the report of the Ways and Means Committee:

this bill amends the present provisions relating to a gain on the sale of a taxpayer's principal residence so as to eliminate a hardship under existing law which provides that when a personal residence is sold at a gain the difference between its adjusted basis and the sale price is taxed as a capital gain. The hardship is accentuated when the transactions are necessitated by such facts as an increase in the size of the family or a change in the place of the taxpayer's employment. In these situations the transaction partakes of the nature of an involuntary conversion.[9]

When the sale of the old residence and the purchase of the new residence is necessitated by a change in employment location, Congress viewed the situation as an "involuntary conversion type of case" in which the need for relief is "especially clear."[10] Congress recognized that most individuals will need the proceeds from the old house undiminished by a capital gains tax to purchase a new house of equivalent value, and that this is a poor time to impose a capital gains tax. There is nothing in the legislative history to indicate this clearly expressed remedial purpose is inapplicable when a poor real estate market or the unavailability of mortgage money requires an individual to lease his old premises for a temporary period concurrent with and ancillary to sales efforts. To hold otherwise would make relief dependent on the vicissitudes of the real estate and money markets.[11]

In determining whether a temporary rental deprives a home of its character as a principal residence Congress deliberately

---

[9] H. Rept. No. 586, to accompany H.R. 4473 (Pub.L.No. 183), 82d Cong., 1st Sess., p. 27 (1951).

[10] *Id.* at 28. See also S. Rept. No. 781, 82d Cong., 1st Sess., p. 35 (1951), and 97 Cong. Rec. 696 (1951) (remarks of Congressman Forand).

[11] It can be contended (although the respondent has not done so) that temporary rentals cannot in any event exceed the 1 year within which a new residence must be acquired after selling the old one or the old residence sold after acquiring a new one. The difficulty with this argument is that the 1-year replacement period is measured from the date of *sale* of the old residence (not the date it is *vacated*) to the purchase of a new one. Petitioners clearly complied with this requirement. There is no logical reason why this period, probably intended to insure continuity of investment, should be used to determine (without regard to the facts and circumstances involved) whether temporary rentals deprive a home of its character as a principal residence. To do so ignores the need·most individuals have for the proceeds from the old residence to purchase a new one, the very assumption on which Congress predicated the relief provided. It would also mean that in order to qualify for relief, a taxpayer, when unable to sell his home· due to "facts and circumstances" beyond his control, would have to leave the property vacant after renting for 1 year. We believe if Congress intended such a hard and fast rule it would have said so rather than specifically directing our attention to the "facts and circumstances" in each case.

provided latitude to effectuate the remedial policy of the statute by making a determination depend on the "facts and circumstances" of each case. Petitioners habitually used their Mill Valley residence as their principal residence as required by the statute.[12] The parties have stipulated that the petitioners had no plans for this former residence other than to dispose of it as soon as an offer was received; that they received no offers to purchase the house until the time of sale in 1969; that financial circumstances dictated acceptance of an offer to rent in the spring of 1967 and again in the fall of 1968; and that the primary wish of petitioners was to sell their old residence. Additionally, the earlier lease included an option to purchase and the property was left vacant for substantial periods in order to facilitate sales efforts by the real estate broker with whom petitioners had listed the property.

We believe these rentals were necessitated by the exigencies of the real estate market, were ancillary to sales efforts, and arise from petitioners' use of the Mill Valley property as their principal residence. The rental activities and the sale of the property were precipitated by the change in Mr. Clapham's employment location that Congress viewed as an "involuntary conversion" situation where the need for relief is "especially clear." In leasing the premises, petitioners' dominant motive was to sell the property at the earliest possible date rather than to hold the property for the realization of rental income. Under the facts and circumstances here present, the lease was therefore for a temporary period contemplated by the legislative history and the regulations,[13] and petitioners are entitled to the benefits of section 1034.

*Decisions will be entered under Rule 155.*

---

[12] *Robert W. Aagaard,* 56 T.C. 191, 203 fn. 13 (1971).
[13] See sec. 1.1034-1(c) (3), Income Tax Regs.