ROBERT B. RICHARDSON AND PEARL P. RICHARDSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richardson v. Commissioner
Docket No. 4205-75.
United States Tax Court
T.C. Memo 1978-322; 1978 Tax Ct. Memo LEXIS 191; 37 T.C.M. (CCH) 1335; T.C.M. (RIA) 78322; August 16, 1978, Filed *191 While president and general manager of a company, the taxpayer was expected and required by the company to make certain gifts and incur certain travel and entertainment expenses. Upon becoming chairman, he was no longer required to incur these expenses although the company approved and benefited therefrom. Petitioners purchased a cottage in Maui, Hawaii, because they believed they could no longer travel and because they no longer wished to remain in Montana during the winter. Upon the advice of a friend, they felt they could rent the cottage when they were not using it and that it would appreciate in value. Held, because petitioner's expenditures were not made in the course of discharging his duties as an employee, he is not entitled to deduct them. Held,further,o, petitioners did not have a profitseeking motive in acquiring the cottage, nor did a conversion from personal use to investment occur after they decided to leave and sell the cottage. George T. Bennett, for the petitioners. Craig D. Platz, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies of $ 3,420.73 and $ 2,303.37 in petitioners' Federal income tax for the calendar years 1971 and 1972, respectively. The issues presented for our consideration are: (1) Whether certain expenses incurred by petitioners in maintaining a cottage, and a loss incurred on its sale, are deductible. (2) Whether petitioners are entitled to certain claimed business deductions for gifts, entertainment and travel. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Robert B. Richardson (hereafter Robert) and Pearl P. Richardson (hereafter Pearl), husband and wife, timely filed their joint income tax returns for the calendar years 1971 and 1972 with the Internal Revenue *194 Service Center at Ogden, Utah. At the time their petition was filed, petitioners resided in Helena, Montana.
After Robert graduated from the University of Michigan in 1920, he was employed by the New World Life Insurance Company in Spokane, Washington as an associate actuary until January 1, 1928; at that time, he became actuary (an officer) of MontanaLife Insurance Company (hereafter Montana) in Helena, Montana. Shortly thereafter, he was appointed vice-president of Montana and in 1933 became its executive vice-president, chief executive, and general manager. In 1938, Montana changed its name to Western Life Insurance Company (hereafter Western) and Robert was named its president and general manager. In 1963, Robert was named chairman of Western. [1] He held this title until 1974 at which time he was named chairman emeritus of Western. As chairman of Western during the years in question, petitioner did no routine work but was required to be available for advice and consultation, including his attendance at various board *195 and committee meetings and participation on the director's executive compensation and finance committees. In 1957, Western became a wholly-owned subsidiary of St. Paul Fire & Marine Insurance Company, now The St. Paul Companies, Inc. (hereafter St. Paul), a Minnesota corporation. Robert owned approximately 10 percent of Western stock prior to the merger. Immediately thereafter, he owned between one-half and one percent of St. Paul's outstanding stock. During 1971 and 1972, petitioners received dividends on their St. Paul stock of almost $ 150,000. During the same period, Robert's salary from the Company was less than $ 16,500. While president of Western, Robert's annual compensation was $ 39,000 plus an annual bonus. Included in his salary, however, was reimbursement for entertainment and other expenses Robert incurred on behalf of Western pursuant to a 1959 corporate resolution. [2] Upon becoming chairman of Western in 1963, Robert volunteered that his compensation be reduced from $ 39,000 to $ 25,000 annually. This was done. However, he could have retained his $ 39,000 salary had he wished to do so. While chairman, Robert's compensation was again reduced (to $ 7,500) *196 at his request. In order to meet business conditions of the 1930's, a company policy of having a "family business" atmosphere was developed by Robert, thereby creating a personal relationship with officers, agents, employees, stockholders, and policyowners of Montana and Western (which policy he continued after Western was acquired). This was accomplished primarily by figts and entertainment. Thus, prior to 1964, Robert was expected to engage in business entertainment and make gifts, and it had been a longstanding custom for him to do so. Western was aware and approved of Robert's expenditures for the business deductions claimed in 1971 and 1972. The gifts in question consisted of Christmas and wedding gifts *197 to Company employees and members of their families which were made in accordance with Robert's philosophy of treating employees as part of a family. Gifts of identical items for the same occasions were made to family friends and relatives. Over the years, however, petitioners have considerably reduced the number of such gifts. The entertainment expenses in question were incurred principally either for the benefit of personal friends who were retiring or had already retired from Western, or to celebrate other special, nonbusiness occasions of employees such as wedding anniversaries. Beginning in 1955, petitioners traveled abroad almost every year. Robert and Pearl would prepare a booklet describing the places they visited, including a description of their culture, history, geography, and architecture. These booklets were printed, bound, and distributed as a good will and public relations item at Western's expense to officers, directors, employees, agents, stockholders, and business associates, as well as to personal friends and relatives. After St. Paul purchased Western, the practice continued and St. Paul furnished Robert with an additional list of persons to whom they wanted *198 the books sent. Petitioners deducted one-fourth of the travel expenses for the Asian tour taken in 1971 (one-half of Robert's expenses, none of Pearl's). A booklet was prepared by them, and in accordance with previous practice, the booklet was printed and distributed at company expense to certain employees, officers, and shareholders of both Western and St. Paul. Petitioners' cottage in Hawaii was part of the International Colony Club (hereafter Club), a condominium-type development located in Kaanapali, Maui, Hawaii. The Club contained 44 cottages which were individually owned with the grounds being held in common under a long-term lease expiring in the year 2020. The Club had a manager on the premises who oversaw the rental of all cottages available for rent in addition to overseeing maid service, landscaping, the swimming pool, and maintenance. Petitioners acquired their cottage because of Robert's fear that they would no longer be able to continue their extensive, world-wide travels due to his having eye surgery which resulted in impaired vision. Also, they no longer desired to reside in Helena during the winter months. On the advice of a close friend, petitioners also *199 believed that the cottage would appreciate in value and be easy to rent when they were not using it. However, they made no substantial inquiries as to investment value prior to the cottage's purchase of either the cottage or other cottages in Hawaii. The cottage contained two bathrooms, two bedrooms, a living room, a kitchen-dining room combination, but no garage. Petitioners purchased the cottage in 1969 and occupied it from approximately December 1, 1969 to April 1970, and from January 4, 1971 to April 6, 1971. At the time they acquired their cottage, petitioners extended an invitation to Western employees to use it rent free when they were not using it and some did take advantage of the invitation. The manager of the Club was informed by petitioners when they wanted the cottage rented, and he handled all the details in that connection. It is not clear whether the Club was listed with various travel agencies and real estate agencies although the Club received rental applications through such sources. Rentals offered by petitioners were for short-term only since petitioners did not allow management to make long-term rentals. However, one reason petitioners decided to sell *200 their cottage in 1971 was a recent resolution by the board of directors of the Club requiring that cottage owners notify the Club manager six months in advance of the periods they wished to occupy their own cottage. This resolution was unacceptable to petitioners because they felt it might interfere with their personal use of the cottage. Another reason that petitioners decided to sell their cottage was that Robert's impairment of vision was not as great a handicap as anticipated and would not prevent their continued traveling. Upon leaving their cottage in April 1971, after having made travel reservations for a tour around the world, petitioners advised the management that the cottage was to be rented until sold and that they did not intend to return. The cottage was finally sold in March 1972 at a loss. Petitioners continued to take yearly vacation trips to Maui after they sold their cottage. During the years in question, the cottage was rented for $ 40 to $ 45 per day or $ 240 to $ 270 per week, less 10 to 15 percent paid travel agencies for renters which they referred. During 1971, petitioners' cottage was rented for eight days. Petitioners received $ 805.99 gross income *201 in 1971 from rental of their cottage and incurred expenses (excluding real estate taxes) and depreciation of $ 4,049.62. Petitioners received $ 308.65 in rental income in 1972 from their cottage and incurred expenses and depreciation of $ 3,619.42. Petitioners felt that the cottage had not been rented more often because of an epidemic of hepatitis, an influx of "hippies" and nudists, and poor management during the time they owned the cottage. Also, it was necessary to either rent the cottage or have it frequently cleaned while they were not using it because of possible termite or gecko infestation. Respondent determined that petitioners acquired and maintained the cottage primarily for personal reasons and not for a profit. He accordingly disallowed a deduction for those expenses (in excess of those permitted under section 183) [3] and for the loss incurred on the cottage's sale. Respondent also disallowed the expenses incurred for entertainment, gifts, and travel as not constituting "ordinary and necessary" business expenses of Robert. OPINION Petitioners contend that *202 as a condition of Robert's employment he was expected to entertain and make gifts without any right of reimbursement and, therefore, they are entitled to deduct expenses incurred with respect thereto as ordinary and necessary business expenses. They argue further that Western distributed the travel booklets in issue here to employees and other business associates as an advertising and morale-building practice and that one-half of the travel expenses of their 1971 trip are deductible as an ordinary and necessary business expense. Finally, with respect to the vacation cottage, it is petitioners' position that it was purchased primarily for the purpose of making a profit thereby permitting a deduction under section 212[4] for expenses incurred in maintaining the property (including depreciation) and a deduction under section 165 for the loss incurred on its sale. *203 Deductions are allowable under section 162(a) only for "ordinary and necessary expenses paid or incurred during the taxable [years] in carrying on any trade or business * * *." If a corporate officer is required to incur entertainment expenses or make gifts in the course of discharging his executive duties, he may deduct unreimbursed expenses actually paid by him as ordinary and necessary expenses of his business as a corporate executive. But because the business of the corporation is not considered the business of its shareholders or officers, Burnet v. Clark,287 U.S. 410 (1932), unreimbursed expenditures undertaken for the benefit of the corporation by one of its officers are not deductible by the officer. Deputy v. DuPont,308 U.S. 488 (1940). Thus, for petitioners to prevail, Robert must show that the gift and entertainment expenditures in question were made pursuant to corporate policy requiring or expecting him to bear such expenses. Jergens v. Commissioner,17 T.C. 806 (1951). Reimbursement for such expenses or a corporate *204 resolution requiring the assumption of such expenses would tend to indicate that they are a necessary expense of his office. We believe the corporate resolution of 1959 and the testimony adduced at trial regarding the paternalistic nature of the corporate business shows that such expenditures undertaken by Robert while president and general manager of Western (through 1963) would have qualified under this rationale. However, Robert has not shown that such expenditures were either required or expected of him as chairman, although Western was aware and approved of his expenditures in issue here. Robert voluntarily reduced his compensation from $ 39,000 to $ 25,000 in 1963 upon becoming chairman. He later voluntarily reduced his salary even further, and it is doubtful that his salary was still intended to cover such expenses as was the case before he became chairman. When asked if had he sought reimbursement for such expenses whether the company would have reimbursed him, Robert replied "It's never been discussed. * * * If I were making a guess, I'd say yes." [5] Thus, we are led to believe that Robert did not consider his salary to include such expenses. This does not necessarily *205 mean that such expenses were no longer required of Robert, but it goes far to show that had Robert not continued to make gifts or entertain, Western would not have required him to because company policy until such time had been to reimburse him by including an allowance for such expenditures in fixing his salary. See Stolk v. Commissioner,40 T.C. 345, 356 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964). As further support for this, we note that Robert has considerably reduced the number of gifts over the years. Therefore, the deductions claimed for gifts and entertainment must be disallowed. *206 While we are aware that St. Paul (or Western) printed petitioner's booklet describing his Asian tour, this shows only that the company thought it would derive a benefit therefrom, not that it required or expected petitioners to continue traveling for the company. In fact, at the time petitioners purchased their cottage in late 1969, they believed they could no longer travel extensively. Moreover, we maintain serious doubts as to whether the benefits received by Western and St. Paul from the booklet were anything more than incidental to a primarily personal trip. Cf. Henry v. Commissioner,36 T.C. 879 (1961). In these circumstances, we hold that the disallowance of the deductions for these expenditures must also be upheld. We must now deal with the question of whether petitioners' residence in Hawaii constituted "property held for the production of income" so as to entitle them to deductions for maintenance expenses and depreciation under sections 212(2) and 167(a)(2). [6] For petitioners to show that the holding of property for rental is a trade or business within the *207 meaning of section 162, or is a holding of property for the production of income within the meaning of section 212, they must demonstrate that they had a profit-seeking motive in acquiring the cottage. Deductions are not allowable under section 162 or 212 for activities which are carried on primarily for sport, hobby, or for recreation. Section 1.183-2(a), Income Tax Regs.
Whether petitioners acquired and held the cottage for rent primarily for the purpose of making a profit is a question of fact to be determined from all the facts and circumstances of the case. No one factor is determinative, but greater weight is to be given to objective facts than to the taxpayer's mere statement of intent. Sections 1.183-2(a) and 1.183-2(b), Income Tax Regs.; Johnson v. Commissioner,59 T.C. 791, 815 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). *208 Petitioners purchased the cottage when they believed Robert could not travel extensively, and they no longer wished to spend winters in Montana. They made no substantial inquiries prior to the cottage's purchase concerning the rental value or the investment they could expect to recoup on either the cottage or similar condominimums. Petitioners resided in their cottage for four months during the winter of 1969-1970 and for three months during the winter of 1971. This length of time in which they occupied the cottage tends to show that they intended the cottage primarily for personal use. They extended an invitation to company employees to use it rent free while they were not there and some employees did so, and a motivating factor in petitioners' decision to sell the cottage was a resolution by the Club that cottage owners notify the manager six months in advance of the time they wished to use it and petitioners were concerned because this might interfere with their personal use. Thus, it would appear that the rental of the home was at petitioners' convenience, and for rental only when either they or employees were not using it. Moreover, the cottage was available for rent only *209 on a short-term basis. Also, when petitioners discovered that Robert's impairment of vision would not prevent their continued traveling, they sold the cottage. Although petitioners contend that they sold the cottage only because it was unprofitable, the evidence shows that when petitioners no longer believed they would use the cottage extensively, they sold it. Although petitioners continued to make yearly trips to Maui, and rented cottages while there, this does not support petitioners' contention that the cottage was purchased for rental profit. It seems likely, rather, that because the rental income from the cottage was insufficient to cover costs, it was simply cheaper to rent while they were there. And while we do not doubt that petitioners expected to be able to rent their cottage when they or their friends were not using it or that it would appreciate in value, it seems clear on the facts here that these considerations were primarily to offset the personal expenses of maintaining the property. Finally, we do not believe that upon deciding to sell the cottage in 1971, the cottage was converted into "property held for the production of income." Although petitioners offered *210 the cottage for rent, they were simply attempting to minimize their holding costs until the property was sold and given their prior experiences with attempting to rent the cottage, they could have had no bona fide expectation of doing so. On these facts, we must hold that petitioners are not entitled to deduct depreciation and maintenance expenses under section 212 or 167(a)(2). Although the cases recognize a distinction between the tests under sections 212 and 167 and the test for deducting a loss on the sale under section 165 and section 1.165-9(b)(1), Income Tax Regs., which requires the property to be "otherwise appropriated to incomeproducing purposes," the distinction is without significance here. [7] Under Grammer v. Commissioner,12 T.C. 34 (1949), and cases thereafter, a sale at a loss of a former residence which has not been actually rented but merely offered for rent is not deductible under section 165. The record here reflects only that petitioners instructed the Club to sell the cottage and to offer it for rent in an attempt to *211 minimize their expenses until the cottage was sold. This does not meet petitioners' burden for, as we noted earlier, there was no conversion to income producing property for purposes of sections 212 and 167 and the test for conversion under section 165 is more stringent than under those sections. Petitioners attempt to distinguish the Grammer line of cases by pointing out that the property in this instance was in fact rented prior to its "conversion" while in these other cases there was no rental prior to conversion. However, the point of those cases is not that the personal residences were never rented prior to conversion, but rather that for purposes of section 165 conversion from personal use cannot be effected unless the property is actually rented after conversion. The fact that the property was rented does not suffice to show there was a conversion for purposes of section 165. Accordingly, we hold that petitioners are not entitled to a deduction under section 165 for their loss on the sale of the cottage. Decision will be entered for the respondent. Footnotes
1. This is to be distinguished from the chairman of the board at Western who, apparently, had no responsibilities except to preside at board meetings.↩
2. The resolution stated, in partinent part: The Board of Directors of the Western Life Insurance Company have down through the years, in considering the salary of Mr. R. B. Richardson, President of the Company, taken into consideration the fact that Mr. Richardson finds it necessary to do considerable entertaining and stand other expenses in connection with his office as President of the Company on behalf of the Company, which he has paid from his personal income.↩
3. All statutory references are to the Internal Revenue Code as in effect for the years in issue.↩
4. Petitioners do not argue that the purchase and rental of the cottage during the years in question constituted a trade or business for purposes of section 162(a), contending only that it was property held for the production of income within the meaning of section 212. On the facts before us, however, the test of deductibility under either section would be the same. See Daniel v. Commissioner,T.C. Memo. 1978-277↩.
5. We note that expenses for business entertainment which would have been reimbursed had the employee who incurred them so requested of his employer are not deductible because they are not "ordinary and necessary" expenses. Kennelly v. Commissioner,56 T.C. 936, 943 (1971), affd. without opinion 456 F.2d 1335 (2d Cir. 1972); Podems v. Commissioner,24 T.C. 21, 22-23 (1955). Thus, not only must Robert show that the expenses incurred were a condition to his employment, but also that he could not be reimbursed. Fountain v. Commissioner,59 T.C. 696, 708↩ (1973). We are reluctant to base our holding on this theory, however, because the only evidence presented at trial regarding possible reimbursement by the company was this one sentence of testimony.
6. It is noted that section 280A, added by P.L. 94-455, section 601(a), Tax Reform Act of 1976, deals with expenses incurred in connection with the rental of vacation homes for taxable years beginning after December 31, 1975.↩
7. See McAuley v. Commissioner,T.C. Memo. 1976-276↩.