**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE PAUL RICHARD CHERRETT;
COLLEEN COURTNEY CHERRETT,

*Debtors*,

ASPEN SKIING COMPANY,

*Appellant*,

v.

PAUL RICHARD CHERRETT; COLLEEN
COURTNEY CHERRETT; ART
CISNEROS, Chapter 7 Trustee,

*Appellees.*

No. 14-60079

BAP No.
14-1056

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Kirscher, Dunn, and Taylor, Bankruptcy Judges, Presiding

Argued and Submitted November 8, 2016
Pasadena, California

Filed October 16, 2017

Before: Marsha S. Berzon, Morgan Christen,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Christen;
Dissent by Judge Nguyen

# SUMMARY[*]

## Bankruptcy

The panel affirmed the Bankruptcy Appellate Panel's decision affirming the bankruptcy court's denial of a creditor's motion to dismiss a Chapter 7 bankruptcy petition for abuse under 11 U.S.C. § 707(b)(1).

Agreeing with other circuits, the panel held that the bankruptcy court's order was final and appealable because it conclusively resolved the debtors' ability to file a Chapter 7 bankruptcy petition and conclusively determined the discrete issue whether a debt was primarily non-consumer and therefore subject to discharge under Chapter 7.

The panel held that the debtor's housing loan, made by an employer to an employee as a key part of a compensation package, qualified as non-consumer debt. The panel held that the bankruptcy court did not clearly err in finding that the debtor incurred the housing loan primarily for a non-consumer purpose connected to furthering his career. Accordingly, § 707(b)(1), which allows the bankruptcy court to dismiss a case filed by a debtor whose debts are primarily consumer debts, did not apply.

Dissenting, Judge Nguyen wrote that the correct standard of review was de novo because the case involved undisputed facts and the only issue was the legal conclusion to be drawn from those facts, and the panel majority created an intra- and

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

inter-circuit split by reviewing for clear error. Judge Nguyen wrote that under de novo review, it was clear that the housing loan was consumer debt incurred by an individual primarily for a personal, family, or household purpose.

## COUNSEL

Scott Talkov (argued) and Michael G. Kerbs, Reid & Hellyer APC, Riverside, California, for Appellant.

Kathleen J. McCarthy (argued) and Thomas H. Casey, Law Office of Thomas H. Casey Inc., Rancho Santa Margarita, California; Leslie Keith Kaufman, Law Offices of Kaufman & Kaufman, Santa Ana, California; for Appellees.

## OPINION

CHRISTEN, Circuit Judge:

This case calls for the court to decide whether a housing loan, made by an employer to an employee as a key part of a compensation package, qualified as a non-consumer debt. If the loan was a non-consumer debt, the bankruptcy court properly denied Aspen Skiing Company's motion to dismiss the Cherretts' Chapter 7 bankruptcy petition under 11 U.S.C. § 707(b)(1). On the other hand, if the loan was a consumer debt, the bankruptcy court erred by denying the motion to dismiss. The Bankruptcy Appellate Panel (BAP) affirmed the bankruptcy court, ruling that the bankruptcy court's order was final and appealable and that there was sufficient evidence that the Cherretts incurred the loan for a non-consumer

purpose. We have jurisdiction under 28 U.S.C. § 158(d), and we affirm the BAP.

## I. BACKGROUND

### A. Cherrett's Employment with Aspen

Paul Cherrett (Cherrett) began working in the hospitality industry in 1979. He spent approximately twenty-five years with the Four Seasons hotel chain, including five years at the Four Seasons in Jackson Hole, Wyoming. In December 2006, while Cherrett lived and worked in Jackson Hole, he heard about an open managerial position at Aspen Skiing Company (Aspen) in Colorado. He did not apply for the position because it did not offer any new responsibilities compared to his job at the Four Seasons. Months later, in 2007, Cherrett learned that Aspen had created a new upper-management position with expanded responsibilities. He expressed interest to an executive search firm and interviewed for the job.

Aspen offered Cherrett a position leading its hospitality division as a senior vice president heading up the expansion of Aspen's "Little Nell Hotel" brand, Aspen's prestigious "flagship property." Cherrett understood that if the Little Nell Hotel expansion continued, he might have the opportunity to oversee brand development in Jackson Hole and move back to his home there. Cherrett also understood that if he accepted the position with Aspen, he would need to live near Aspen's office in Colorado, at least initially. This represented a challenge because his daughter had two years of high school left, Cherrett and his wife did not want to relocate her to a new school, and in Cherrett's view, the salary proposed by Aspen did not cover the high cost of

living in the Aspen area nor offer sufficient incentive to disrupt his family's life in Wyoming.  The salary was not enough for him to afford to buy a home in Aspen, and rentals there were "few and far between" and also very expensive.

In negotiations regarding compensation, Aspen eventually offered a $500,000 housing loan (Housing Loan) in addition to an annual salary of $300,000.  The Housing Loan was interest-only for the first ten years and it was coupled with a bonus plan providing Cherrett a guaranteed annual bonus of up to $33,750 to cover the interest payments on the loan.  The annual bonuses were timed to coincide with the date the annual interest payments were due, ensuring that, for the first ten years, Cherrett would have no out-of-pocket expenses related to the loan.  If Cherrett left his position for any reason other than death or disability within two years, he would have to repay the loan and pay Aspen an additional $140,000.  He would have to pay $120,000 for leaving within three to four years; $100,000 for leaving within five to six years; and $80,000 for leaving within seven to eight years.  Cherrett would not have to repay any additional interest on the loan if he continued to work for Aspen through 2015.  Aspen estimated the value of the plan at $330,750 over a period of ten years.

Only with the Housing Loan did Cherrett find Aspen's offer attractive enough to accept.  He left his job and family in Jackson Hole, and purchased a condominium near Aspen for $995,000.  The Housing Loan covered $500,000 of the purchase price, and Cherrett financed $417,000 with a loan from a market-rate lender.

Cherrett's wife and daughter remained at the family home in Jackson Hole so that his daughter could finish high school

there.  The condominium in Colorado was smaller than the family home in Jackson Hole and did not have enough space to accommodate Cherrett's wife and two children.  With hopes of relocating back to Jackson Hole to develop the Little Nell Hotel brand, Cherrett considered the Colorado condominium a "place holder" and only moved clothing and personal items there.  He visited his home and family in Jackson Hole "at every opportunity," returning for holidays, birthdays, anniversaries, and his daughter's prom and high school graduation.  He continued using financial institutions in Wyoming, and kept his vehicle registration there.

In 2008, the economy crashed and Aspen abandoned plans to expand the Little Nell Hotel brand.  It became clear that Aspen would not be relocating Cherrett back to Jackson Hole.  So in 2009, after Cherrett's daughter graduated from high school and moved away to college, his wife joined him in Colorado and they sold their home in Jackson Hole.  In 2011, four years after joining Aspen, Cherrett resigned from his position.

## B.  Bankruptcy Proceedings

Cherrett and his wife filed a voluntary Chapter 7 bankruptcy petition on August 30, 2013.  They owed Aspen $550,000 under the terms of the Housing Loan.  Aspen filed a motion to dismiss the Chapter 7 petition for abuse under 11 U.S.C. § 707(b)(1).  The statute allows a court to "dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter."  11 U.S.C. § 707(b)(1).  Aspen argued that because the Cherretts incurred the Housing Loan to purchase a personal residence, the debt was a consumer debt, and they

were not entitled to Chapter 7 relief in light of their ability to pay their creditors in a hypothetical Chapter 13 plan.[1]

The bankruptcy court held an evidentiary hearing to determine whether the debt owed to Aspen qualified as consumer debt. After hearing testimony from Cherrett, the bankruptcy court found that Aspen offered Cherrett the Housing Loan to entice him "to leave a secured position," and that Cherrett purchased the Colorado property so he could "make more money" and "work at a very prestigious, top of the line" resort. The bankruptcy court thus determined that the Housing Loan "was incurred for a business purpose" and did not constitute consumer debt. The bankruptcy court denied Aspen's motion to dismiss.

Aspen appealed to the BAP. The BAP concluded that the order denying Aspen's motion was final and appealable, and also concluded that the bankruptcy court's finding that Cherrett incurred the Housing Loan for a non-consumer purpose was subject to clear error review. Based on the testimony and facts presented to the bankruptcy court, the BAP ruled that there was sufficient evidence to find that Cherrett obtained the Housing Loan primarily "for a business purpose with respect to his employment with Aspen." The BAP therefore affirmed the bankruptcy court's order denying Aspen's motion to dismiss under 11 U.S.C. § 707(b)(1).

---

[1] The Cherretts do not dispute that they would be ineligible to file a Chapter 7 bankruptcy petition based on means if they incurred primarily consumer debts.

## II.  STANDARD OF REVIEW

"Decisions of the BAP are reviewed de novo."  *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002).  "We independently review a bankruptcy court's ruling on appeal from the BAP."  *Id.*  "We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error."  *Id.*

## III.  DISCUSSION

### A.  We Have Jurisdiction Over This Appeal.

The bankruptcy court's ruling must be final for this court to exercise jurisdiction under 28 U.S.C. § 158(d).  *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 911 (9th Cir. 1988).  Here, the bankruptcy court denied Aspen's motion to dismiss, and the BAP affirmed.  Ordinarily, orders denying a motion to dismiss would not constitute final, appealable orders because they do not "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment." *Sahagun v. Landmark Fence Co. (In re Landmark Fence Co.)*, 801 F.3d 1099, 1102 (9th Cir. 2015) (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373–74 (1981)).

In bankruptcy appeals, however, we have recognized "that the fluid and sometimes chaotic nature of bankruptcy proceedings necessitates a degree of jurisdictional flexibility."  *Id.*  A bankruptcy court's order that is affirmed or reversed by the BAP is final and appealable where the order:  "1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed."  *SS Farms, LLC v. Sharp (In re SK Foods, L.P.)*,

676 F.3d 798, 802 (9th Cir. 2012) (quoting *Dye v. Brown (In re AFI Holding)*, 530 F.3d 832, 836 (9th Cir. 2008)).

We have not expressly decided whether a bankruptcy court's order denying a motion to dismiss under 11 U.S.C. § 707(b) constitutes a final, appealable order. The majority of circuits that have addressed the issue have concluded that orders on motions to dismiss for abuse of Chapter 7 are appealable. *See Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 43 (1st Cir. 2009) (collecting cases); *but see Barben v. Donovan (In re Donovan )*, 532 F.3d 1134, 1137 (11th Cir. 2008) (holding that an order denying a motion to dismiss a Chapter 7 case under an earlier version of § 707(b) was not appealable). These circuits recognize that the current version of § 707(b), part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, "manifest[s] a congressional policy to police all Chapter 7 cases for abuse at the outset of a Chapter 7 proceeding" as well as "pragmatic considerations that indicate that the denial of a § 707(b) motion to dismiss is different from the denial of other motions to dismiss." *McDow v. Dudley*, 662 F.3d 284, 288 (4th Cir. 2011).

We have often concluded that other bankruptcy court orders are final and appealable based on "policies of judicial efficiency and finality." *Kelly*, 841 F.2d at 911; *see also Meyer v. U.S. Trustee (In re Scholz)*, 699 F.3d 1167, 1170 (9th Cir. 2012). These policies apply in this case. As the Fourth Circuit explained:

> Section 707(b) creates a statutory gateway based on whether the case is abusive, and an order denying that motion to dismiss as abusive, in effect, finally and conclusively

> resolves the issue. If the denial of a § 707(b) motion to dismiss cannot be appealed immediately . . . , the Chapter 7 proceedings would have to be completed before it could be determined whether the proceedings were abusive in the first place.

*McDow*, 662 F.3d at 289–90. Here, the bankruptcy court's order resolved the Cherretts' ability to file a Chapter 7 bankruptcy petition. The order conclusively determined the discrete issue whether the Cherretts' debt was primarily non-consumer and therefore subject to discharge under Chapter 7. We thus hold that the bankruptcy court's order denying Aspen's motion to dismiss under § 707(b) was final and appealable to this court.**[2]**

## B. The Bankruptcy Court Did Not Err by Finding that the Housing Loan Was a Non-Consumer Debt.

### 1. We Review for Clear Error the Bankruptcy Court's Findings Regarding the Purpose of the Debt.

---

**[2]** On December 3, 2014, after Aspen filed a notice of appeal in this court, the bankruptcy court issued a discharge of the Cherretts' debts. Aspen argues that the bankruptcy court did not have jurisdiction to enter the discharge and that this court should vacate it. But Aspen did not appeal the discharge to the BAP, seek a stay of proceedings pending appeal, or amend its notice of appeal. The record does not show any exceptional circumstances for failing to appeal the issue to the BAP or a district court. Thus, whether the discharge was erroneously issued is not properly before us. *See Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

If the bankruptcy court applied fact to law in a way that "'requires an inquiry that is essentially factual,' we review it as if it were a factual finding," but if the bankruptcy court applied fact to law in a way that "requires reference to 'the values that animate legal principles,' we review it as if it were a legal finding." *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc), *abrogated on other grounds as recognized by Teutscher v. Woodson*, 835 F.3d 936, 942 (9th Cir. 2016)). Inquiries that are essentially factual "include[] questions such as motive, intent, and negligence." *Id.* at 1260. "[M]ixed questions of law and fact" are those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982). "Mixed questions are typically reviewed de novo, but, depending on the nature of the inquiry involved, *may be reviewed under a more deferential clearly erroneous standard*." *United States v. Lang*, 149 F.3d 1044, 1047 (9th Cir. 1998), *amended by* 157 F.3d 1161 (9th Cir. 1998) (emphasis added).

Aspen argues that because the parties do not dispute the underlying facts concerning the use of the Housing Loan, de novo review applies. Aspen further argues that a debt incurred to purchase a personal residence is a consumer debt as a matter of law. Aspen cites our holding in *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir. 1988), in support of its arguments.

The debtors in *Kelly* filed a Chapter 7 bankruptcy petition with multiple mortgages against their home. *Id.* at 910. The

bankruptcy court found that the debt was primarily consumer, but the BAP reversed on the basis that debts secured by real estate mortgages categorically do not qualify as consumer debt. *Id.* at 911. On appeal to this court, the debtors continued to argue that debts secured by real property can never be consumer debt. *Id.* at 912. We disagreed and held that consumer debt can include mortgages. *Id.* at 912–13. In doing so, we reviewed the BAP's ruling de novo because the question whether mortgages could *ever* qualify as consumer debt was purely one of law. *Id.* at 911; *see also id.* at 911–12 (concluding that legal issues predominated where "the Kellys argue[d] that debts secured by real property are never consumer debts, relying on floor statements made in the House and Senate prior to the enactment of the 1978 Act").

We did not hold that all debts secured by real property are consumer debt. In fact, we expressly left open the possibility that some are not: "While secured debt is not automatically excluded from consumer debt, *it is not automatically included either*. We must look to the purpose of the debt in determining whether it falls within the statutory definition." *Id.* at 913 (emphasis added). *Kelly* acknowledged that in most cases "the purchase of a home and the making of improvements thereon" will meet the statutory definition of consumer debt, but it did not fashion a bright line rule. *Id.* Aspen's argument—that because most debts used to purchase homes are consumer debts, all mortgages must be consumer debts—is contrary to our case law.

We have never, as Aspen and the dissent suggest, held that debts used to purchase homes are consumer debts as a matter of law, and unlike in *Kelly*, where there was no dispute regarding the purpose of the loan, the parties here dispute whether Cherrett incurred the Housing Loan primarily for a

business purpose. Whether Cherrett's primary purpose satisfies the statutory requirements for a Chapter 7 bankruptcy filing is a mixed question of law and fact. Although we would typically review such a question de novo, the bankruptcy court's weighing of Cherrett's multiple motives for incurring the Housing Loan was primarily a factual, rather than legal, inquiry. *See Ornelas v. United States*, 517 U.S. 690, 702 (1996) ("Where a trial court makes . . . commonsense determinations based on the totality of circumstances, it is ordinarily accorded deference."). In this case, the purpose of the Housing Loan is the sort of "essentially factual" inquiry that we review for clear error, *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009),[3] but we would reach the same result on de novo review.

---

[3] Courts are split on this standard of review. The Eighth Circuit BAP is in accord with our conclusion that the purpose of a debt is a factual finding reviewed for clear error. *See Lapke v. Mut. of Omaha Bank (In re Lapke)*, 428 B.R. 839, 842 (B.A.P. 8th Cir. 2010). The Tenth and Fifth Circuits have reached the opposite conclusion. *See Stewart v. U.S. Trustee (In re Stewart)*, 175 F.3d 796, 803 (10th Cir. 1999); *Matter of Booth*, 858 F.2d 1051, 1053 n.5 (5th Cir. 1988). But like our decision in *Kelly*, the Fifth Circuit's decision in *Booth* turned on whether an entire category of debt must *always* be consumer or non-consumer, a legal rather than factual question. *See Booth*, 858 F.2d at 1055 ("Similarly, the district court erred in its determination that a signature loan, *no matter what use to which it is put*, is always consumer debt." (emphasis added)). The same is true of *IRS v. Westberry (In re Westberry)*, 215 F.3d 589 (6th Cir. 2000) and *Cypher Chiropractic Ctr. v. Runski (In re Runski)*, 102 F.3d 744 (4th Cir. 1996), unilluminating cases the dissent suggests we overlook. The sole issue presented in *Westberry* was legal: "whether federal income and self-employment taxes should be considered consumer debt" categorically. *Westberry*, 215 F.3d at 590. *Runski* also addressed a categorical question: whether medical equipment used at the debtor's business was nevertheless intended primarily for personal use solely because it was titled in the debtor's name. *Runski*, 102 F.3d at 747.

**2. The Bankruptcy Court Did Not Clearly Err by Finding That Cherrett Incurred the Housing Loan Primarily for a Non-Consumer Purpose.**

"Consumer debt" is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). We have held that "[d]ebt incurred for business ventures or other profit-seeking activities is plainly not consumer debt." *Kelly*, 841 F.2d at 913. Courts determine the debtor's purpose as of the time the debt was incurred. *See Bushkin v. Singer (In re Bushkin)*, BAP No. CC-15-1285-KiKuF, 2016 WL 4040679, at *7 (B.A.P. 9th Cir. July 22, 2016).[4]

Evidence that a debtor incurred a debt "purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business," can serve as an important factor in determining the debtor's purpose. *Stewart v. U.S. Trustee (In re Stewart)*, 215 B.R. 456, 465 (B.A.P. 10th Cir. 1997), *aff'd*, 175 F.3d 796 (10th Cir. 1999) (discussing how courts should determine a debt's purpose in the context of student loans). To determine the purpose of a home loan, it is not sufficient that a debtor hoped that the asset purchased with it would appreciate in value. *See Cox v. Fokkena (In re Cox)*, 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004) (holding that it is insufficient that debtors "subjectively hope[] that [a] Residence [will] appreciate in value" when "the objective evidence in the record amply supports the bankruptcy court's finding that Debtors incurred the debts primarily for family or household purposes under § 101(8)"). Instead, it is

---

[4] The appeal in *Bushkin* is currently stayed pending resolution of this case.

appropriate to consider all the circumstances indicative of the debtor's primary purpose. *Westberry*, 215 F.3d at 593 ("[W]hile the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt."); *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996) (determining that a debt owed pursuant to a divorce judgment was consumer debt because it was not incurred "with a profit motive *or in connection with a business transaction*" (emphasis added)) .

Here, the bankruptcy court found that Cherrett primarily had a business purpose—not a personal, family, or household purpose—for incurring the Housing Loan. Cherrett testified that he accepted Aspen's offer and the Housing Loan so that he could "grow in salary and responsibility" and have the opportunity to oversee expansion of the Little Nell Hotel brand. The bankruptcy court found that Cherrett incurred the debt "so he could work at a very prestigious, top of the line, equal to the Four Seasons, equal to the best hotels in the world," resort. The record leaves little doubt that the Housing Loan helped entice Cherrett to "leave a secured position."

Cherrett further testified that when he incurred the Housing Loan, his family did not intend to relocate to Colorado with him, and he considered the condominium a "place holder." He lived alone in the condominium for two years, moving only his clothing and some personal effects from Wyoming. It is clear that the Housing Loan did not go toward the purchase of a primary residence, or even a secondary vacation residence, for his family. Indeed, the condominium did not even accommodate his family of four. At the time Cherrett incurred the debt, he did not intend to remain in Colorado for any substantial length of time. In fact,

he hoped that he would get the chance to relocate back to Jackson Hole to spearhead the Little Nell Hotel brand development there.

Cherrett purchased the Colorado condominium using the Housing Loan and relied on the annual bonus of $33,750 for interest payments.[5] The Housing Loan was a below-market-rate loan that Cherrett likely could *only* have obtained from his employer. The lender that originated the loan was an affiliate of Aspen, controlled by one of Aspen's principals, and later transferred the debt to Aspen itself. Without Aspen's assistance, Cherrett could not have afforded to buy real estate close enough to work at Aspen's Colorado office. Cherrett also testified that renting a home was not an option based on both availability and price. The Housing Loan was a key component of Cherrett's compensation, made through his employer, which covered all of his annual out-of-pocket expenses related to its financing for the first ten years through bonuses and continued employment. No evidence suggests the Housing Loan would have been commercially available on the terms Cherrett received. This is not the ordinary situation where a person takes out a loan to move closer to a job for convenience or better schools, for example. This is

---

[5] Correspondence confirming Cherrett's acceptance of Aspen's job offer memorialized that Cherrett's compensation included a "deferred compensation/executive bonus plan" that was guaranteed to provide annual bonuses timed to coincide with "the date upon which annual interest on the [Housing Loan] [was] due." This arrangement was designed "to ensure that [Cherrett had] no annual out of pocket expenses related to the financing of [the] loan" for its first ten years. Before the bankruptcy court, Aspen's lawyers characterized this arrangement as the employer "provid[ing] a bonus to the employee equivalent to the interest on the loan, pay[ing] itself the interest from that bonus, and pay[ing] the employee the taxes on that income at the assumed tax rate of 35%."

the unusual situation where a person accepts a loan from his employer as part of a larger transaction to further his career. On these facts, the bankruptcy court did not clearly err when it found the Housing Loan and the annual bonus were part of Cherrett's negotiated compensation package, undertaken for a business purpose connected to furthering his career, rather than a personal, family, or household expense. *See Bushkin*, 2016 WL 4040679, at \*8 (explaining that in this case, "the home loan had a business purpose" because "it was an integral part of the business arrangement between the parties").

## IV. CONCLUSION

We affirm the BAP's judgment on the order denying Aspen's motion to dismiss.

**AFFIRMED.**

---

NGUYEN, Circuit Judge, dissenting:

The majority applies the wrong standard of review, creating a circuit split in the process, and with undue deference to the Bankruptcy Appellate Panel's ("BAP") erroneous decision, affirms it. When a case involves undisputed facts and the only issue is the legal conclusion to be drawn from those facts, review is de novo. As for the substantive law, it's clear: When you take out a loan to buy property at which you plan to reside for at least two years without renting it out or otherwise profiting from it, the loan is consumer debt. I therefore dissent.

## I.

According to the majority, "whether Cherrett incurred the Housing Loan primarily for a business purpose" is an "essentially factual" dispute. Maj. Op. at 12–13. That simply isn't true. The parties agree that there are no factual disputes, including Cherrett's subjective intent in obtaining the Housing Loan. *Compare* Aspen's Opening Br. at 7 (asserting that "[t]he only facts found to be relevant by any prior court are undisputed" while acknowledging Cherrett's contention "that other, undisputed facts . . . are also relevant"), *with* Cherrett's Br. at 6 ("None of the facts in this case are in contention . . . . Aspen has not asserted that any mistake was committed by the Bankruptcy Court in its findings of fact.").

What the parties contest is whether these undisputed facts—including, to the extent relevant, Cherrett's various reasons for obtaining the Housing Loan—render the Loan "debt incurred by an individual primarily for a personal, family, or household purpose." *In re Kelly*, 841 F.2d 908, 912 (9th Cir. 1988) (quoting 11 U.S.C. § 101(8)). *Kelly* held in no uncertain terms that when "the underlying facts are not disputed," the question of "whether [a particular debt] qualifies as a 'consumer debt' under" the Bankruptcy Code "is one in which legal issues predominate and is thus subject to de novo review." *Id.*

As a three-judge panel, we aren't free to disregard our prior holdings. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (citing the "unassailable" proposition "that a three-judge panel may not overrule a prior decision of the court"). Not only that, it's beyond debate that "where no facts are in dispute our entire review is de novo." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017)

(quoting *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1091 (9th Cir. 2014)); *see also In re Crawford*, 194 F.3d 954, 957 (9th Cir. 1999) ("Because the relevant facts here are undisputed, our review focuses on the bankruptcy court's legal conclusions, which are subject to de novo review."). This firmly settled standard is an outgrowth of the principle, fundamental to Anglo-American jurisprudence, that "it is the province of the trial court to decide questions of fact, [and] of the appellate court to decide questions of law . . . ." *Reay v. Butler*, 30 P. 208, 209 (Cal. 1892); *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) (recognizing "an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law"); *Wiscart v. D'Auchy*, 3 U.S. (3 Dall.) 321, 329 (1796) ("[T]he law directs that in cases of appeal, part shall be decided by one tribunal, and part by another; the facts by the court below, and the law by this court. Such a distribution of jurisdiction has long been established in England."); *cf. In re McLinn*, 739 F.2d 1395, 1400 (9th Cir. 1984) (en banc) (rejecting as "unsound" the "assumption that the district judge has some particular knowledge or experience in the field of law in issue that is to be given great weight apart from the authorities presented by the parties or articulated by the district judge").

This principle is, for example, the reason why "[d]ecisions of the BAP are reviewed de novo." Maj. Op. at 8 (quoting *In re Su*, 290 F.3d 1140, 1142 (9th Cir. 2002)). The BAP acts in an appellate capacity, deciding questions of law based on facts determined in the bankruptcy court. Because we also review legal questions de novo, it makes no difference whether we formally review the BAP's determinations or the bankruptcy court's, for "we are in as

good a position as the BAP to review bankruptcy court rulings." *In re Findley*, 593 F.3d 1048, 1050 (9th Cir. 2010) (quoting *In re Taggart*, 249 F.3d 987, 990 (9th Cir. 2001)); *see In re Burley*, 738 F.2d 981, 986 (9th Cir. 1984).

"[B]ecause the application of law to fact will generally require the consideration of legal principles, . . . most mixed questions will be reviewed independently," *i.e.*, under a de novo standard. *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir. 1984) (en banc), *abrogated on other grounds by Pierce v. Underwood*, 487 U.S. 552, 557–63 (1988). An "application of the rule of law to the facts" is an "essentially factual" inquiry if it is "founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,'" *id.* at 1202 (quoting *Comm'r v. Duberstein*, 363 U.S. 278, 289 (1960)), or if "some of the elements that bear upon [the legal question] may be known only to the district court," *Pierce*, 487 U.S. at 560. That isn't the case here. Like the BAP, we are determining whether certain agreed-upon facts fall within a statutory definition.

Nor is this a case that involves "a multifarious and novel question, little susceptible . . . of useful generalization," *id.* at 562. The majority isn't publishing our decision today because of its importance to Cherrett—though he will undoubtedly be relieved to avoid his debt obligation. Rather, the majority understands that other debtors will find themselves in similar circumstances and will need guidance as to the legal characterization of their debt.

The majority asserts that "[c]ourts are split on this standard of review." Maj. Op. at 13 n.3. They aren't, aside from the wayward Eighth Circuit BAP decision that the majority cites. Every circuit (including our own in *Kelly*) to

review a bankruptcy court's ruling on whether a particular obligation is "consumer debt" has done so de novo. The majority acknowledges two such cases: *In re Stewart*, 175 F.3d 796, 803 (10th Cir. 1999), and *In re Booth*, 858 F.2d 1051, 1053 n.5 (5th Cir. 1988). There are others. *See In re Westberry*, 215 F.3d 589, 590 (6th Cir. 2000) ("The issue presented here, whether federal income taxes should be considered consumer debt for purposes of 11 U.S.C. § 1301, is a question of law, which we review de novo."); *In re Runski*, 102 F.3d 744, 745, 747 (4th Cir. 1996) ("determining whether debt is for 'personal, family, or household purposes' under § 101(8)" to "aid in determining the proper meaning of the nearly identical language found in § 722" and appearing to treat the question as a matter of statutory construction, "subject to plenary review"). Today the majority needlessly creates an intra- and inter-circuit split.[1]

## II.

"It is difficult to conceive of any expenditure that serves a 'family . . . or household purpose' more directly than does the purchase of a home . . . ." *Kelly*, 841 F.2d at 913. The condo that Cherrett purchased with the Housing Loan may not have felt to him like a "home" in an emotional sense given that his wife and children were living in a different state for much of the time. That Cherrett's heart was in Wyoming shows only that his Colorado condo may not have been his legal domicile, *i.e.*, that "true, fixed, principal, and permanent home, to which [a] person intends to return and remain even though currently residing elsewhere." *Domicile*,

---

[1] There's no reason for the majority's oddly deferential approach. The majority acknowledges that it would reach the same result under de novo review. Maj. Op. at 13.

*Black's Law Dictionary* (10th ed. 2014). It was, however, his "home" in the legal sense of being his "dwelling place," *Home*, *Black's Law Dictionary* (10th ed. 2014), or "principal residence," 11 U.S.C. § 101(13A). A "temporary home" (as Cherrett described it), perhaps—but still a home. Cherrett intended to live there for at least two years. *Cf. Stolk v. Comm'r*, 40 T.C. 345, 356 (1963) (holding that New York apartment where taxpayer moved to be near his office was his "principal residence" for a year notwithstanding weekend and holiday trips to his Virginia farm where he and his wife planned to settle).

I agree with the majority that the Housing Loan's classification as consumer or non-consumer debt should be based on the purpose of the debt at the time Cherrett incurred it. And the majority properly rejects any contention that the debt was for a business purpose merely because Cherrett expected eventually to profit from the "skyrocketing" housing prices in the Aspen area. *In re Cherrett*, 523 B.R. 660, 672 (B.A.P. 9th Cir. 2014). Virtually all homebuyers in certain regions of the country expect to profit when they sell their homes.

But the majority conflates Cherrett's purpose in moving to Colorado with his purpose in taking out the Housing Loan. The fact that he moved to Colorado primarily if not exclusively for business purposes proves too little. Under the majority's analysis, a person could move her family across town in order to be closer to a new job and, if she takes out a home loan to finance her new residence, it would be for a business rather than a personal, family, or household purpose. It makes no difference that this hypothetical move is out of convenience and Cherrett's was arguably out of necessity. A person's primary purpose in making a decision isn't

dependent on the existence of alternative options. Moreover, how is a court even to determine whether it's necessary to purchase a new home for work purposes? Here, for example, there's no evidence that Cherrett needed to take a new job out of state. He made $225,000 a year in Wyoming and "was very happy in [his] position."

This line of reasoning ignores the statutory text. The statute defines "consumer debt" as "*debt* incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8) (emphasis added). It is the purpose of the debt—*i.e.*, what the debt is used for—that matters. The debtor's indirect purposes are irrelevant.

Until now, this is the approach we have taken. *See In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004) ("Under *Kelly*, whether or not a particular secured debt is excluded from inclusion as 'consumer debt' under § 707(b) depends on the purpose of the debt."). In *Price*, we explained that "Price's personal residence was secured by two mortgages. The first . . . [was] incurred to purchase the home; the second . . . incurred to finance household improvements." *Id.* Thus, there was "no question that the secured debt at issue was incurred 'primarily for a personal, family or household purpose' and must be considered 'consumer debt' for the purposes of § 707(b)." *Id.* We did not examine Price's motivation for purchasing a personal residence and making improvements to it.

The legislative history supports this interpretation.[2] Congress adapted the Bankruptcy Code's definition of "consumer debt" from the consumer protection laws—in particular the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602(i), which contains a similar definition. *See In re Booth*, 858 F.2d 1051, 1054 (5th Cir. 1988). *Compare* 11 U.S.C. § 101(8) ("The term 'consumer debt' means debt incurred by an individual primarily for a personal, family, or household purpose."), *with* 15 U.S.C. § 1602(i) ("The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."). For that reason, courts interpreting the Bankruptcy Code's definition of "consumer debt" look to TILA and cases interpreting it. *See Booth*, 858 F.2d at 1054; *In re Almendinger*, 56 B.R. 97, 99 (Bankr. N.D. Ohio 1985).

In determining whether a transaction is commercial or personal for the purposes of TILA, we generally consider the factors employed by the Federal Reserve Board under Regulation Z, 12 C.F.R. pt. 226 supp. I, subpt. A, § 226.3(a). *See Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1069 (9th Cir. 1992). Crucially, "[c]redit extensions by a company to its employees" are "consumer-purpose" loans under the regulations "if the loans are used for personal purposes." *Id.*

---

[2] To be fair, there is support in the legislative history that "consumer debt does not include a debt to any extent the debt is secured by real property." 124 Cong. Rec. 32,393 (1978) (statement of Rep. Edwards). However, *Kelly* and "most [other] courts have declined to follow this legislative history and instead include home mortgages in the determination of whether a debtor has primarily consumer debts." 6 *Collier on Bankruptcy* ¶ 707.04[2][b] (16th ed. 2017).

pt. 226, supp. I, subpt. A, § 226.3(a)(3)(iii)(A). That's precisely the situation here. Aspen subsidized Cherrett's condo loan, but the condo itself was used for a personal purpose—Cherrett lived there. "[D]ebt incurred to purchase the debtor's principal residence . . . is a 'consumer debt' under [11 U.S.C.] § 101(8)." *In re Fadel*, 492 B.R. 1, 15 (B.A.P. 9th Cir. 2013) (citing *Kelly*, 841 F.2d at 913); *see also* 15 U.S.C. § 1602(x) (defining "residential mortgage transaction" as "a transaction in which a . . . consensual security interest is created or retained against the consumer's dwelling to finance [its] acquisition"); *cf. Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072, 1076 (9th Cir. 2001) (looking to "the actual use to which [a] backhoe was put" in concluding that its financing was consumer debt under the similarly worded Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(5), because "the backhoe was used strictly for personal use, and was never used by [the owner's company]").

The majority theorizes that Cherrett's debt is work-related because he incurred it as an incident of his employment; even though the loan money was directly used to purchase his residence, it was indirectly used as a means of extracting more income from his employer in the form of subsidized interest. The majority emphasizes that Cherrett could not have afforded to live close to his new job without this housing assistance. Maj. Op. at 16.

The Tenth Circuit rejected a similar argument about a loan's ultimate purpose in *Stewart*. The debtor borrowed $320,000 from his former in-laws, which "his ex-wife used . . . to support their family, including use for house payments, groceries, pre-school, children's activities, moving expenses, and family vacations" while he pursued a medical degree so

that he could earn more money for his family. 175 F.3d at 807. The Tenth Circuit concluded that "the main purpose of these loans was [not] to finance [the debtor's] actual educational expenses. Rather, [he] used the money to support his family because he did not earn enough for his family to live comfortably." *Id.* The Tenth Circuit also concluded that "a substantial portion of [the debtor's $200,000 in] student loan debt is indeed 'consumer debt'" because it "went toward his family's expenses." *Id.* In short, *Stewart* repudiated the idea that a loan could be for a particular purpose just because it indirectly facilitated that goal.

To see the difficulties the majority's analysis entails, one need look no further than the instant case. Cherrett's purposes were several: He needed a place in Colorado to live and sleep when not at work or visiting his family in Wyoming. That's a consumer purpose. Cherrett's reason for being in Colorado was to take a new job, which is a business purpose. But the "primary driver" for Cherrett in accepting the new job was that he might "end up" in Jackson Hole with his family "for the mid to long term" if and when Aspen expanded its operations there. That's a personal purpose. Under the majority's holding, any of these purposes could have been found controlling. The characterization of Cherrett's loan as business debt turned only on the whims of the bankruptcy court.

The majority contends that this was not an "ordinary" home loan because Cherrett's employer "covered all of his annual out-of-pocket expenses related to its financing for the first ten years" so long as Cherrett remained in his job. Maj. Op. at 16. That is enormously inaccurate.

Aspen didn't pay the interest that Cherrett owed on the debt. Aspen merely *compensated* him for the interest payments that *he* was contractually obligated to make to the lender—a third party—on commercially reasonable terms.[3] Although from Cherrett's perspective, Aspen's bonuses made his obligation to make interest payments relatively painless, the two were legally unrelated. Home mortgage interest payments potentially reduce one's tax liability, whereas the bonuses from Aspen increased Cherrett's tax burden. For that very reason, Aspen provided Cherrett with additional compensation to cover most (but not all) of his assumed 35% tax liability on the bonuses.[4]

This compensation for interest and taxes, a total of $33,750 per year, isn't at issue. What's at issue is Cherrett's indebtedness on the loan. Cherrett wasn't entitled to the housing compensation unless "[t]he proceeds of the loan [were] used to acquire [the] condominium." And so they were.

The majority's holding today does not help debtors so much as create massive uncertainty for lenders in gauging the riskiness of home loans, thereby imposing greater financing costs on homebuyers. The majority replaces *Kelly*'s straightforward standard—all loans to purchase a home are consumer debt—with an unworkable one that requires lenders

---

[3] The $500,000 note, secured by a second deed of trust in favor of Areljay, L.P., the lender, required interest payments at a rate of 5% per year during the loan's 10-year term. Cherrett agreed to repay the principal at the end of the loan term or it would be subject to a 10% annual interest rate thereafter.

[4] Cherrett was out of pocket about $3,000 per year in uncompensated taxes based on the assumed tax rate of 35%.

to assess a homebuyer's amorphous purposes in changing residences. Since lenders cannot easily make this determination, interest rates for all homebuyers will rise. Lenders unable to predict whether particular homebuyers can potentially abuse the bankruptcy process to write off mortgage debt will face higher risks for which they must be compensated.

## III.

Properly classifying the Housing Loan as consumer debt would not preclude Cherrett from obtaining bankruptcy relief. "[T]he existence of primarily consumer debt alone does not result in dismissal under § 707(b), because the bankruptcy court must still make a finding of substantial abuse." *Price*, 353 F.3d at 1139. This factual finding is based on a number of case-specific factors, and the bankruptcy court is appropriately afforded considerable discretion in making it. *See id.* at 1140. "Consequently, a debtor truly in need of a fresh start will not be subject to dismissal" just because the majority of his debt is a home loan. *Id.* at 1139 (citing *Kelly*, 841 F.2d at 913).

I respectfully dissent.